ERIC P. ISRAEL (State Bar No. 132426)
*EPI@LNBYG.COM*
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Ave.
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

Attorneys for Sam S. Leslie, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:24-bk-19380-BR |
| HAEDEUK YAE, | Chapter 7 |
| Debtor. | **TRUSTEE'S NOTICE OF MOTION AND MOTION TO APPROVE COMPROMISE WITH CHROMOLOGIC, LLC AND NARESH MENON AND FOR ANCILLARY RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATIONS OF SAM S. LESLIE AND TIMOTHY J. McINNIS AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF** |
| | Date: May 12, 2026 |
| | Time: 10:00 a.m. |
| | Place: Courtroom "1668" |
| | 255 E. Temple St. |
| | Los Angeles, CA 90012 |

PLEASE TAKE NOTICE THAT on May 12, 2026, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom "1668" at 255 E. Temple Street, Los Angeles, California, Sam S. Leslie, the Chapter 7 trustee (the "Trustee") for the estate of Haedeuk Yae (the "Debtor" and the "Estate"), will and hereby does move the Court for an order (the "Motion") approving a Settlement Agreement between the Trustee and Chromologic, LLC ("Chromologic") and Naresh Menon ("Menon") (collectively the "Defendants").

The Debtor, jointly with Donald Johnson ("Johnson") (collectively the "Co-Relators") under the Federal Claims Act (the "FCA"), brought a lawsuit against the Defendants, alleging,

1

among other things, that their former employer, Chromologic, had falsified records and research, and submitted fraudulent bills to various agencies of the federal government. The Lawsuit was eventually transferred to the United States District Court for the Central District of California (the "District Court" and the "Lawsuit"), where it remains pending. Pursuant to the FCA, the Co-Relators offered the Lawsuit to the federal government, which declined to take over the Lawsuit. As a result, the Co-Relators would be entitled to between 25 and 30 percent of any recovery. The Trustee was advised that the Lawsuit potentially could be worth many millions of dollars.

The Co-Relators were represented by McInnis Law and certain co-counsel (collectively "McInnis" or "Special Counsel"). After the Debtor filed bankruptcy and the Trustee was appointed, the Trustee retained McInnis as his special litigation counsel. Among other things, the employment order provided that all fees and costs were subject to allowance by the Court under 11 U.S.C. § 328.

During the course of litigation, the District Court struck certain valuable theories because Special Counsel had failed to plead them in the operative complaint. After two mediation sessions, the parties agreed, subject to approval of the federal government, the District Court and the Bankruptcy Court, that the Defendants would pay $500,000 for damages and $450,000 for statutory attorneys' fees, for a total of $950,000. Payments are to be made over time. The parties also trade mutual releases. The settlement agreement restates that the attorneys' fees and costs are subject to approval of the Bankruptcy Court. Payments are to be made over time, with first payments paid to the federal government. The federal government eventually agreed that the Co-Relators would be entitled to 28.5% of the recovery. All parties signed off on the settlement agreement and to date all other approvals have been received, and the settlement is only subject to Bankruptcy Court approval, as is allowance of attorneys' fees and costs.

The proposed settlement will not allow the Trustee to pay a meaningful distribution to creditors in its present form. The Trustee is not seeking through this motion to allow attorneys' fees and costs of Special Counsel, as the Trustee disputes the sums they are asserting. Among other things, the Trustee believes that the sums sought are disproportionate to the recovery and that Special Counsel committed malpractice by failing to ensure that all appropriate theories were

2

included in the operative complaint, including fraud in the inducement.  The Trustee makes the following projections:

| | |
|---|---|
| Settlement amount: | $500,000.00 |
| Statutory Attorneys' fees | $450,000.00 |
| Total Settlement Payment | $        950,000.00 |

| | |
|---|---|
| Damages | $500,000.00 |
| Less:  71.5% to federal government | <$357,500.00> |
| Subtotal for Co-Relators | $142,500.00 |
| Special Counsel:  fees (@33 1/3rd%) | <$47,500.00> |
| Special Counsel:  costs | <0>[1] |
| Sum left for Co-Relators | $95,000.00 |
| Debtor's share (@ 50%) | $47,500.00 |
| Less:  Debtor's Exemption | $23,050.00 |
| Sum for Estate: | $24,450.00 |

| | |
|---|---|
| Sums for Special Counsel (statutory fees): | $490,000.00 |
| + contingency fee | $47,500.00 |
| Total for Special Counsel | $537,500.00 |

Thus, absent an adjustment, Special Counsel would be receiving $537,500.00, and the Co-Relators would be projected to receive a total of $95,000.00, or only 10,0% of the total, split evenly between them.  That sum will cover the Debtor's allowed exemption, but only about 30% of administrative expenses, leaving nothing for pre-petition creditors.

---

[1]  Special counsel has incurred costs of $65,262.93, but has agreed not to collect that from the Co-Relators' share.

3

The District Court has ordered the Trustee to file this Motion by March 27, 2026.

By the Motion, the Trustee seeks approval of the Settlement with the Defendants, with a full reservation of how those fees and costs should be allocated.  Because the Trustee has a dispute with Special Counsel, the Trustee requests that the Court set a deadline of 60 days from the date of approval of this compromise to file its final fee application so the Court can determine the allowed amount of fees and costs.  The Trustee further requests that the Court direct that the payment of the settlement sum and attorneys' fees, net of sums payable to the U.S. Government, or $592,500, be directed to the Trustee to be held in a segregated account, to be disbursed only pursuant to further order from this Court.  The Trustee further requests authority to pay Donald Johnson his share and the Debtor up to the amount of his exemption.

The Motion will be based on this notice and Motion, the Memorandum of Points and Authorities, the Declarations of Sam S. Leslie and Timothy J. McInnis and the Request for Judicial Notice, all of which are attached hereto, the papers and pleadings in the Debtor's bankruptcy case, and such other evidence that may be presented at the hearing.  For further information, see the Motion.

NOTICE IS HEREBY FURTHER GIVEN that, pursuant to Local Bankruptcy Rule 9013-1(f), any response to the Motion shall be in writing, filed with the Court and served upon counsel for the Trustee named in the upper left-hand corner of this notice, and the United States Trustee, 915 Wilshire Blvd., Suite 1850, Los Angeles, California 90017, not less than 14 days before the hearing.  Failure to do so may be deemed to be consent to the granting of the Motion.

DATED:  March 27, 2026

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.

By:    /s/ Eric P. Israel
ERIC P. ISRAEL
Attorneys for Sam S. Leslie, Chapter 7 Trustee

4

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 7

STATEMENT OF FACTS ...................................................................................................... 7

    A.   Bankruptcy Background ............................................................................................ 7

    B.   The Lawsuit .............................................................................................................. 7

    C.   The Trustee's Employment of Special Counsel ....................................................... 7

    D.   The Proposed Settlement .......................................................................................... 8

    E.   The Effect of the Settlement on Creditors ............................................................... 9

    F.   Requested Relief .................................................................................................... 11

II. ARGUMENT .................................................................................................................. 11

    A.   Approval of the Allocation is Appropriate ........................................................... 11

        1.   Probability of Success in Litigation.................................................................. 13

        2.   Complexity of the Litigation Involved .............................................................. 13

        3.   Difficulties in Collection .................................................................................. 13

        The Trustee believes that this factor also supports a settlement............................... 13

        4.   Paramount Interest of Creditors........................................................................ 13

    B.   The Court Should Establish a Procedure and Deadlines for Special Counsel to File Final
Fee Application and Fix Fees and Costs................................................................. 14

III. CONCLUSION................................................................................................................ 14

DECLARATION OF SAM S. LESLIE................................................................................. 16

    A.   The Proposed Settlement ....................................................................................... 17

    B.   The Effect of the Settlement on Creditors ............................................................. 18

DECLARATION OF TIMOTHY J. MCINNIS ..................................................................... 20

REQUEST FOR JUDICIAL NOTICE .................................................................................. 22

    A.   Bankruptcy Background .......................................................................................... 22

    B.   The Trustee's Employment of Special Counsel and Settlement with the Debtor ................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re A & C Properties*,
   784 F.2d 1377 (9th Cir. 1986), *cert. denied*, 479 U.S. 854, 107 S. Ct. 189 (1986)...................8

*In re Carla Leather, Inc.*,
   44 B.R. 457 (Bankr. S.D.N.Y. 1984)...........................................................................9

*In re Circle K Corp.*,
   279 F.3d 1077 (9th Cir. 2001) ...................................................................................7

*In re Confections by Sandra, Inc.*,
   83 B.R. 729 (B.A.P. 9th Cir. 1987) ............................................................................7

*Protective Committee for Independent Stockholders of TNT Trailer Ferry, Inc. v.*
   *Anderson*,
   390 U.S. 414 (1968)....................................................................................................7

*United States v. Alaska National Bank (In re Walsh Construction, Inc.)*,
   669 F.2d 1325 (9th Cir. 1982) ...................................................................................8

**Federal Statutes**

11 U.S.C.
   § 328 ..................................................................................................................*passim*

28 U.S.C.
   § 157(b)(2)(A), (B), (E), (M) and (O) .......................................................................7
   §§ 1334 and 157.........................................................................................................7

United States Code Title 11 Chapter 7 ...............................................................*passim*

Federal Claims Act .............................................................................................................1

**Other Authorities**

Federal Rule of Bankruptcy Procedure 9019(a) ................................................................7

Federal Rules of Bankruptcy Procedure 9019 ...................................................................7

Local Bankruptcy Rule 9013-1(f).......................................................................................4

Rule 2002(a) .......................................................................................................................7

6

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

**A.      Bankruptcy Background**

On or about November 18, 2024, Haedeuk Yae (the "Debtor") commenced this case by filing a voluntary petition for relief under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code").  Sam S. Leslie was appointed as the Chapter 7 trustee for the Debtor's estate and continues to serve in that capacity for the benefit of creditors.

**B.      The Lawsuit**

The Debtor scheduled as an asset the following interest in a lawsuit:  "Debtor is a Co-relator in Lawsuit in DC district along with Donald Johnson and has an agreement of 50% to any recovery from the claim.  See claim below listed against Chromologic, LLC value not known could be in the Millions, Any settlement is Dependent on US Gov Approval, claiming all available exemption see below [sic]," and valued the Lawsuit at $10 million.  As mentioned below, the Lawsuit was later transferred to the United States District Court for the Central District of California, before the Honorable Percy Anderson (the "District Court").  Copies of pertinent pages from the Debtor's schedules are attached to the Request for Judicial Notice collectively as Exhibit "2".  A copy of the first amended complaint for the Lawsuit (the "Complaint") is attached to the Leslie Declaration as Exhibit "3".

The Debtor claimed and was allowed a "wild-card" exemption in the Lawsuit of $23,050.00.  Exhibit "2".

**C.      The Trustee's Employment of Special Counsel**

The Trustee discussed the case with the law firm that the Co-Relators had retained, McInnis Law as special litigation counsel ("McInnis" or "Special Counsel").  McInnis similarly advised that the Lawsuit could be worth many millions of dollars.  Applicant reviewed the engagement agreement and discussed and negotiated employment terms.

/ / /

With Court approval, the Trustee retained McInnis as special litigation counsel. *Docket no. 33*. Exhibit "4". Under the retention agreement, the Debtor had entered into a contingency agreement with McInnis which provides, among other things, as follows:

(a) If the United States or any state or local government intervenes with respect to any Claim, as described in Section 5 above (an "Intervened Claim"), ATTORNEY shall receive a contingent fee equal to forty per-cent (40%) of the amount of any and all proceeds obtained by CLIENT as the relator's share with respect to any intervened Claim (the "Relator's Share").

(b) If neither the United States nor any state or local government chooses to intervene with respect to any Claim (a "Declined Claim"), and if ATTORNEY and CLIENT have agreed to continue to litigate the Declined Claim, as provided in Section 5 above, ATTORNEY shall receive a contingent fee equal to fifty percent (50%) of the amount of any and all proceeds obtained by CLIENT as the Relator's Share with respect to any Declined Claim.

(c) If there is a mix of Intervened Claims and Declined Clams, the contingency on any successful Intervened Claims will forty per-cent (40%) and the contingency fee on any successful Declined Claims will be fifty percent (50%), as provided in sub-sections (a) and (b) above. Dkt. 28.

Because the USA did not intervene, the percentage would be 50% of any recovery plus any statutory attorneys' fees awarded. More recently, McInnis offered to voluntarily reduce the contingency fee to 33 1/3% and waive costs. Again, the engagement and the allowance of fees and costs remain subject to Court approval with fees to be considered under section 328. Dkt 28.

**D.      The Proposed Settlement**

The parties to the Lawsuit attended two mediation sessions. At the first session, the parties were far apart because a number of legal issues remained open, including a fraud in the inducement theory. Special Counsel throughout advised the Trustee that the fraud in the inducement theory had the highest potential damages and would be simplest to prove. The parties then went back to District Court and briefed the issues.

In response, the District Court issued a minute order dated November 10, 2025 that, among other things, barred plaintiffs from arguing a fraud in the inducement theory (the "Minute Order").

A copy of an email from Tim McInnis dated November 13, 2025, including the Minute Order is dated November 10, 2025 is attached to the Leslie Declaration as Exhibit "5". The District Court stated that Special Counsel had failed to plead that theory in the underlying Complaint and was barred from arguing it at trial.

After the Minute Order ruling, the parties went back to mediation and ultimately agreed to settle with damages at $500,000 and statutory attorneys' fees at $490,000, to be paid over time, although the Trustee did not accept the attorneys' fees allocation. The proposed settlement remained subject to approval of the U.S. Government, the District Court and the Bankruptcy Court. The parties also trade mutual releases. The U.S. Government ultimately agreed but insisted that first dollars go to the U.S. Government. The parties to the litigation agreed.

In the interim, co-relator Donald Johnson passed away and was succeeded in the Lawsuit by his executor.

The settlement was documented, and a copy of the fully executed settlement agreement is attached to the Leslie Declaration as Exhibit "1". The settlement eventually was approved formally by the federal government. The plaintiffs and the U.S. Government negotiated that the Co-Relators would receive 28.5% of the recovery (out of the applicable statutory range of 25-30%).

The District Court has ordered the Trustee to file this Motion by March 27, 2026.

**E.      The Effect of the Settlement on Creditors**

The Trustee makes the following projection on disbursements under the proposed Settlement:

| | |
|---|---|
| Settlement amount: | $500,000.00 |
| Statutory Attorneys' fees | $450,000.00 |
| Total Settlement Payment | $950,000.00 |
| | |
| Damages | $500,000.00 |
| Less:  71.5% to federal government | <$357,500.00> |
| Subtotal for Co-Relators | $142,500.00 |
| Special Counsel:  fees (@33 1/3rd%) | <$47,500.00> |

9

| | |
|---|---|
| Special Counsel:  costs | <$0>[2] |
| Sum left for Co-Relators | $95,000.00 |
| Debtor's share (@ 50%) | $47,500.00 |
| Less:  Debtor's Exemption | $23,050.00 |
| Sum for Estate: | $24,450.00 |
| | |
| Sums for Special Counsel (statutory fees) | $490,000.00 |
| + contingency fee | $47,500.00 |
| Total for Special Counsel | $537,500.00 |

The claims bar date in the Debtor's bankruptcy case passed on April 8, 2025 for general unsecured creditors, and July 7, 2025 for claims of governmental units. *Docket no. 10.*  Four proofs of claim were filed against the Estate timely*,* and one claim was late-filed*.*

Without an adjustment to Special Counsel's fees, the Debtor's exemption would be paid but no funds will flow to pre-petition creditors and administrative creditors will only receive about 30% of their fees and costs..  This is because Special Counsel, if granted his request in full – 33 1/3% of the recovery plus $490,000 of statutory attorneys' fees, would receive a total of $537,500.00, with the Debtor's share limited to $47,500.00.  Not only does the Trustee believe that this is an obscene and unconscionable outcome, but the Trustee believes that Special Counsel committed malpractice by failing to include in, or later amend, the Complaint to plead what were the "most valuable claims".  As discussed below, the Court has authority under section 328 to modify an award if the terms of engagement prove to have been improvident in light of developments not capable of being anticipated at the time of employment.  In re Circle K Corp., 279 F.3d 1077 (9th Cir. 2001); In re Confections by Sandra, Inc., 83 B.R. 729, 731 (B.A.P. 9th Cir.

---

[2] Special counsel has incurred costs of $65,262.93, but has agreed not to collect that from the Co-Relators' share.

1987).  The Trustee believes that the reduced recovery, caused in large part by the malpractice of Special Counsel, is such a development that could not have been anticipated at the time of employment.

**F.      Requested Relief**

The Trustee respectfully requests that the Court grant this Motion, approve the settlement, direct Special Counsel within 60 days to file a final fee application to fix their fees and costs, and order that any settlement payments shall be directed to the Trustee to be held in a segregated account pending the allowance of fees and costs of Special Counsel.  The Trustee further prays for all other appropriate relief.

## II.

## ARGUMENT

**A.      Approval of the Allocation is Appropriate**

The Court has jurisdiction over this matter pursuant to the provisions of 28 U.S.C. §§ 1334 and 157 and Federal Rules of Bankruptcy Procedure 9019.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (M) and (O).

Federal Rule of Bankruptcy Procedure 9019(a) provides:  "On motion by the trustee and after a hearing on notice to creditors, the debtor and indenture trustees as provided in Rule 2002(a) and to such other entities as the court may designate, the court may approve a compromise or settlement."

The Supreme Court, in *Protective Committee for Independent Stockholders of TNT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968), held that a bankruptcy court, in considering whether to approve a compromise, should:

> apprise [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.  Further, the judge should form an educated estimate of the complexity, expense and likely duration of such litigation, the possible difficulties in collection on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

The Ninth Circuit has clarified the inquiry as follows:

///

11

> In determining the fairness, reasonableness and adequacy of a proposed compromise, the court must consider: (a) probability of success in litigation, (b) the difficulties, if any, to be encountered in the matter of collection, (c) the complexity of litigation involved, and the expense, inconvenience and delay necessarily attending it, and (d) the paramount interest of the creditors and a proffered deference to their reasonable views in the premises.

*In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986) (citations omitted), *cert. denied*, 479 U.S. 854, 107 S. Ct. 189 (1986).

The Trustee, the party proposing the compromise, admittedly has the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved. *Id.* Although "the objections of creditors to the compromise must be afforded due deference, such objections are not controlling . . . [W]hile the court must preserve the rights of the creditors, it must also weigh certain factors to determine whether the compromise is in the best interest of the bankrupt estate." *Id.* at 1382 (citations omitted).

The bankruptcy court has wide latitude and discretion in evaluating a proposed compromise because the judge is "uniquely situated to consider the equities and reasonableness." *United States v. Alaska National Bank (In re Walsh Construction, Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982) (citations omitted). The Ninth Circuit has further stated:

> A compromise agreement allows the trustee and the creditors to avoid the expenses and burdens associated with litigating "sharply contested and dubious" claims. (citations omitted) The bankruptcy court need not conduct an exhaustive investigation into the validity of the asserted claim. (citations omitted) It is sufficient that, after apprising itself of all facts necessary for an intelligent and objective opinion concerning the claim's validity, the court determines that either (1) the claim has a "substantial foundation" and is not "clearly invalid as a matter of law," or (2) the outcome of the claim's litigation is "doubtful." (citations omitted).

*Id.* at 1328.

It is also true that the Court is not "to decide the numerous questions of law and fact raised by [objectors] but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *In re Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984) (quoting *In re W. T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (emphasis added), *cert. denied*, 464 U.S. 822 (1983)), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985)).

1. Probability of Success in Litigation

The parties attended two mediation sessions before a respected, retired judge -- Judge Edward Infante.  The mediation sessions were hard-fought, as Defendants were accused of various forms of fraud.  The District Court judge had placed a limit on the number of witnesses to be presented and barred the Co-Relators for prosecuting the fraud in the inducement theory.  In the meantime, Co-Relator Donald Johnson passed away, and he was an important witness.

Based upon the attached Declaration of Timothy J. McInnis, the lead attorney handling the matter for the Co-Relators as Special Counsel, the Trustee believes that the proposed settlement with the Defendants, with deferral of the allowance of attorneys' fees and costs, is appropriate and should be approved.

The Trustee believes that this factor supports the proposed settlement.

2. Complexity of the Litigation Involved

As mentioned, the issues are quite involved and complex.  The FCA is complex.  Many witnesses and documents would be required.  The Defendants strongly dispute the claims for relief.  The trial would have been complex.  An adverse ruling could well have resulted in an appeal, with its attendant delays, further costs and risk of loww.

The Trustee believes that this factor also supports a settlement.

3. Difficulties in Collection

The Trustee asked for a financial statement on the Defendants, but only received limited information.  Much of Mr. Menon's assets are in a family trust, and it is unclear whether the Defendants could have satisfied a larger judgment.

The Trustee believes that this factor also supports a settlement.

4. Paramount Interest of Creditors

The proposed settlement will allow the Trustee to conclude the Lawsuit on favorable terms as to the Defendants under the circumstances.  The Estate will only minimally benefit unless the

Trustee ultimately succeeds in reducing Special Counsel's awards.  If the Co-Relators had been able to establish fraud in the inducement theory, the damages would have been substantially higher. Regardless, whether creditors or administrative creditors receive any distribution, the Trustee believes that the proposed settlement with the Defendants stands on its own and should be approved.

The Trustee submits that this factor also supports approving the proposed settlement.

The Trustee believes that the proposed settlement is fair and equitable and should be approved, with the Court reserving the issue of allocation and allowance of attorneys' fees.

**B.** **The Court Should Establish a Procedure and Deadlines for Special Counsel to File Final Fee Application and Fix Fees and Costs**

The Trustee requests that the Court direct Special Counsel to file a final fee application within 60 days of the date of entry of the order approving the settlement.  At that time, parties in interest can evaluate Special Counsel's request for fees aggregating $537,500.00, when their clients are to receive a total of $95,000.00, or only 10.0% of the total, to be divided evenly between the two Co-Relators.

In order to preserve the status quo, the Trustee further asks that the Court direct that any payments under the settlement and all attorneys' fees, net of sums to the U.S. Government, aggregating $592,500, be made to the Trustee to be held in a segregated account pending further order of this Court.

**III.**

**CONCLUSION**

Based upon the foregoing, the Trustee respectfully requests that the Court:

1.      Grant the Motion in its entirety;

2.      Approve the Settlement Agreement, reserving the issue of allocation and allowance of attorneys' fees and costs of Special Counsel;

3.      Authorize the Trustee to dismiss the Lawsuit;

4.      Direct that Special Counsel file a final fee application within 60 days of the date of entry of the order approving this Motion or be forever barred from receiving compensation on the Lawsuit;

5.      Order that funds under the Settlement and all attorneys' fees, net of payments to the U.S. Government, aggregating $592,500.00, be directed to and held by the Trustee in a segregated account pending further order of this Court;

6.      Authorize the Trustee to pay Donald Johnson his share and the Debtor up to the amount of his exemption.

7.      Authorize the Trustee to take any and all steps necessary to effectuate the Agreement;

8.      Approve the sufficiency of the notice of hearing on the Motion; and

9.      Provide such other and further relief as the Court deems just and proper.

DATED:  March 27, 2026                LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.


By:    /s/ Eric P. Israel
       ERIC P. ISRAEL
       Attorneys for Sam S. Leslie, Chapter 7 Trustee

**DECLARATION OF SAM S. LESLIE**

I, Sam S. Leslie, declare as follows:

1.       I am the Chapter 7 trustee for the bankruptcy estate of Haedeuk Yae (the "Debtor"). I have personal knowledge of the facts in this declaration, except for those matters that are based upon information and belief, and as to such matters, I believe such matters to be true.  If called as a witness, I could testify competently to these facts.

2.       This declaration is being filed in support of my Motion to Approve Compromise with Chromologic, LLC and Naresh Menon and for Ancillary Relief (the "Motion").

3.       Shortly after my appointment, I discussed the case with the law firm that the Co-Relators had retained, the McInnis Firm as special litigation counsel ("McInnis" or "Special Counsel").  McInnis similarly advised that the Lawsuit could be worth many millions of dollars. Applicant reviewed the engagement agreement and discussed and negotiated employment terms.

4.       With Court approval, I retained McInnis as special litigation counsel. *Docket no. 33*.  The employment order is attached hereto as Exhibit "4".  Under the retention agreement, the Debtor had entered into a contingency agreement with McInnis which provides as follows:

(a) If the United States or any state or local government intervenes with respect to any Claim, as described in Section 5 above (an "Intervened Claim"), ATTORNEY shall receive a contingent fee equal to forty per-cent (40%) of the amount of any and all proceeds obtained by CLIENT as the relator's share with respect to any intervened Claim (the "Relator's Share").

(b) If neither the United States nor any state or local government chooses to intervene with respect to any Claim (a "Declined Claim"), and if ATTORNEY and CLIENT have agreed to continue to litigate the Declined Claim, as provided in Section 5 above, ATTORNEY shall receive a contingent fee equal to fifty percent (50%) of the amount of any and all proceeds obtained by CLIENT as the Relator's Share with respect to any Declined Claim.

(c) If there is a mix of Intervened Claims and Declined Clams, the contingency on any successful Intervened Claims will forty per-cent (40%) and the contingency fee on any successful Declined Claims will be fifty percent (50%), as provided in sub-sections (a) and (b) above. Dkt 28.

16

5. Because the USA did not intervene, the percentage is 50% of any recovery plus any statutory attorneys' fees awarded. More recently, McInnis offered to voluntarily reduce the contingency fee to 33 1/3% and not charge the Co-Relators' share with costs. Again, the engagement and the allowance of fees and costs remain subject to Court approval with fees to be considered under section 328. Dkt 28.

6. At various times, Mr. McInnis advised me that the most valuable claims for relief were the fraud in the inducement claims. He also stated that those would be the easiest to prove, rather than have to analyze every contract Chromologic had with the federal government.

A.      **The Proposed Settlement**

7. The parties to the Lawsuit attended two mediation sessions. At the first session, the parties were far apart because a number of legal issues remained open, including the fraud in the inducement theory. Special Counsel throughout advised me that the fraud in the inducement theory had the highest potential damages and would be simplest to prove. The parties then went back to District Court and briefed the issues.

8. In response, the District Court issued a minute order dated November 10, 2025 that, among other things, barred plaintiffs from arguing a fraud in the inducement theory (the "Minute Order"). A true and correct copy of an email Tim McInnis sent me on November 13, 2025, including the Minute Order is attached hereto, marked as as Exhibit "5" and incorporated herein by this reference. The District Court stated that Special Counsel had failed to plead that theory in the underlying Complaint and was barred from arguing it at trial.

9. After the Minute Order ruling, the parties went back to mediation and ultimately agreed to settle with damages at $500,000 and statutory attorneys' fees at $490,000, to be paid over time, although I did not accept division as to attorneys' fees. The proposed settlement remained subject to approval of the U.S. Government, the District Court and the Bankruptcy Court. The U.S. Government ultimately agreed but insisted that first dollars go to the U.S. Government. The parties to the litigation agreed.

17

10. In the interim, co-relator Donald Johnson passed away and was succeeded in the Lawsuit by his executor.

11. The settlement was documented, and a copy of the fully executed settlement agreement is attached hereto, marked as Exhibit "1" and incorporated herein by this reference. The settlement eventually was approved formally by the federal government. The plaintiffs and the U.S. Government negotiated that the Co-Relators would receive 28.5% of the recovery (out of the applicable statutory range of 25-30%).

12. The District Court has ordered me to file this Motion by March 27, 2026.

**B.** **The Effect of the Settlement on Creditors**

13. I make the following projection on disbursements under the proposed Settlement:

| | |
|---|---|
| Settlement amount): | $500,000.00 |
| Statutory Attorneys' fees | $450,000.00 |
| Total Settlement Payment | $950,000.00 |
| | |
| Damages | $500,000.00 |
| Less: 71.5% to federal government | <$357,500.00> |
| Subtotal for Co-Relators | $142,500.00 |
| Special Counsel: fees (@33 1/3rd%) | <$47,500.00> |
| Special Counsel: costs | <$ 0>[3] |
| Sum left for Co-Relators | $95,000.00 |
| Debtor's share (@ 50%) | $47,500.00 |
| Less: Debtor's Exemption | $23,050.00 |
| Sum for Estate: | $24,450.00 |

[3] Special counsel has incurred costs of $65,262.93, but has agreed not to collect that from the Co-Relators' share.

18

| | |
|---|---|
| Sums for Special Counsel: | $490,000.00 |
| + contingency fee | $47,500.00 |
| Total for Special Counsel | $537,500.00 |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Palm Springs, California on March 27, 2026.

SAM S. LESLIE

19

### DECLARATION OF TIMOTHY J. McINNIS

I, Timothy J. McInnis, declare as follows:

1. I am the principal of McInnis Law ("McInnis"), the duly employed special litigation counsel for Sam S. Leslie, the Chapter 7 trustee (the "Trustee") for the bankruptcy estate of Haedeuk Yae (the "Debtor"). I have personal knowledge of the facts in this declaration, except for those matters that are based upon information and belief, and as to such matters, I believe such matters to be true. If called as a witness, I could testify competently to these facts.

2. This declaration is being filed in support of the Motion to Approve Compromise with Chromologic, LLC and Naresh Menon and for Ancillary Relief (the "Motion").

3. A true and correct copy of the settlement agreement at bar (the "Settlement Agreement") is attached hereto, marked as Exhibit "1" and incorporated herein by this reference.

4. I am familiar with the terms of the Settlement Agreement (Exhibit "1") and the underlying settlement. I have interviewed witnesses, reviewed documents and was preparing this case for trial. I believe that the proposed settlement provided thereunder with the Defendants is fair and equitable to the Debtor and the Trustee under the circumstances and should be approved.

5. The settlement terms were proposed by a court-appointed mediator after two multiday mediation sessions and have been approved by the United States Attorney's Office for theCentral District of California. Moreover, because of the nature of False Claims qui tam litigation (where a private person litigates on behalf of the government to recover funds obtained from the government by fraud) and the posture of the case at the time of settlement, this is an appropriate resolution of the underlying civil lawsuit. This is particularly true given the following: pretrial court rulings; the defendants' ability to pay; and the availability and strength of trial witness testimony and documentary evidence.

6. Although under the engagement agreement McInnis is entitled to a contingency fee of 50% plus the statutory attorneys' fees, McInnis has voluntarily agreed to reduce the contingency fee to 33 1/3%. Costs incurred aggregate $65,262.93. McInnis has voluntarily agreed to waive its right to deduct costs from the Co-Relators' share payment from the United States and will recoup them from the statutory fees and expenses negotiated with the Defendants. I understand that the

request for the Bankruptcy Court to allow the attorneys' fees and costs will be deferred until a later time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at New York City, New York, on March 27, 2026.

TIMOTHY J. McINNIS

21

**REQUEST FOR JUDICIAL NOTICE**

Sam S. Leslie, the Chapter 7 trustee (the "Trustee") for the estate of Haedeuk Yae (the "Debtor"), respectfully requests that the Court take judicial notice of the following facts in the Court's files:

**A.      Bankruptcy Background**

1.      On or about November 18, 2024,  the Debtor commenced this case by filing a voluntary petition for relief under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code").  Sam S. Leslie was appointed as the Chapter 7 trustee for the Debtor's estate and continues to serve in that capacity for the benefit of creditors.

2.      The Debtor scheduled as an asset the following interest in a lawsuit:  "Debtor is a Co-relator in Lawsuit in DC district along with Donald Johnson and has an agreement of 50% to any recovery from the claim.  See claim below listed against Chromologic, LLC value not known could be in the Millions, Any settlement is Dependent on US Gov Approval, claiming all available exemption see below [sic]n" and valued the Lawsuit at $10 million.  The Lawsuit was later transferred to the United States District Court for the Central District of California, before the Honorable Percy Anderson (the "District Court").  True and correct copies of pertinent pages from the Debtor's schedules are attached hereto, marked collectively as Exhibit "2" and incorporated herein by this reference.  A true and correct copy of the first amended complaint for the Lawsuit (the "Complaint") is attached to the Leslie Declaration as Exhibit "3".

3.      The Debtor claimed and was allowed a "wild-card" exemption in the Lawsuit of $23,050.00.  Exhibit "2".

**B.      The Trustee's Employment of Special Counsel and Settlement with the Debtor**

4.      With Court approval, the Trustee retained McInnis Law as special litigation counsel ("McInnis" or "Special Counsel")).  Docket no. 33.  A true and correct copy of the employment order is attached hereto, marked as Exhibit "4" and incorporated herein by this reference.  Under the retention agreement, the Debtor had entered into a contingency agreement with McInnis which provides, among other things, as follows:

///

(a) If the United States or any state or local government intervenes with respect to any Claim, as described in Section 5 above (an "Intervened Claim"), ATTORNEY shall receive a contingent fee equal to forty per-cent (40%) of the amount of any and all proceeds obtained by CLIENT as the relator's share with respect to any intervened Claim (the "Relator's Share").

(b) If neither the United States nor any state or local government chooses to intervene with respect to any Claim (a "Declined Claim"), and if ATTORNEY and CLIENT have agreed to continue to litigate the Declined Claim, as provided in Section 5 above, ATTORNEY shall receive a contingent fee equal to fifty percent (50%) of the amount of any and all proceeds obtained by CLIENT as the Relator's Share with respect to any Declined Claim.

(c) If there is a mix of Intervened Claims and Declined Clams, the contingency on any successful Intervened Claims will forty per-cent (40%) and the contingency fee on any successful Declined Claims will be fifty percent (50%), as provided in sub-sections (a) and (b) above. Dkt 28 at pp. 13-25.  The engagement and the allowance of fees and costs remain subject to Court approval with fees to be considered under section 328 Dkt. 28.

5. The claims bar date in the Debtor's bankruptcy case passed on April 8, 2025 for general unsecured creditors, and July 7, 2025 for claims of governmental units.  Docket no. 10. Four proofs of claim were filed against the Estate timely, and one claim was late-filed.

DATED:  March 27, 2026

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.

By: /s/ Eric P. Israel

ERIC P. ISRAEL
Attorneys for Sam S. Leslie, Chapter 7 Trustee

23

# EXHIBIT "1"

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Confidential Settlement Agreement ("Agreement") is entered into by and between Noelle Johnson, the representative of the Estate of Donald Johnson, deceased ("Representative") and Sam S. Leslie, solely in his capacity as Chapter 7 Trustee of the Bankruptcy Estate of Haedeuk Yae ("Trustee") (jointly, Representative and Trustee are referred to herein as "Relators"), and Defendants Chromologic LLC ("Chromologic") and Naresh Menon ("Menon") (Chromologic and Menon are jointly referred to herein as "Defendants"). Relators and Defendants are collectively referred to in this Agreement as the "Parties." The United States of America (the "United States") is not a party to the Agreement; however, the Agreement is conditioned upon the written consent of the United States to the dismissal of the Civil Action, as defined below.  Naresh Menon and his wife, Shinjini Menon, sign this Agreement in their capacity as Trustee of the Menon Family Trust, dated August 6, 2013 (the "Trust"), solely for the purpose of guaranteeing on behalf of the Trust the payment of the United States Settlement Amount, set forth in Paragraph 3, below and the Fees Settlement Amount set forth in paragraph 5 below upon satisfaction of the conditions set forth paragraph 2 below.

## RECITALS

A.      Chromologic is a limited liability company, registered in California, with its principal place of business located at 1225 S Shamrock Ave, Monrovia, CA 91016. ChromoLogic was founded in 2007 and is a product innovation company that focuses on developing solutions to scientific problems for the government and private sector.

B.      Menon is an adult individual residing in La Canada, California. Menon is the founder and owner of ChromoLogic.

1 | P a g e

C.      Since 2007, ChromoLogic has received government funding to engage in and conduct research for the development of biomedical and industrial solutions that save lives and make the world more secure.

D.      On August 5, 2021, Donald Johnson and Haedeuk Yae (jointly, "Predecessor Relators") filed under seal an action in the United States District Court for the District of Columbia, pursuant to the qui tam provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b), naming ChromoLogic and Menon as defendants. The case was captioned *United States of America ex rel. Donald Johnson and Haedeuk Yae v. Chromologic LLC and Naresh Menon*, Civil Action 21-2184 (RJL) (D.D.C) (the "Civil Action").

E.      On May 30, 2023, the Government, through the U.S. Attorney's Office for the District of Columbia, filed a notice of non-intervention in the Civil Action and, on June 16, 2023, the matter was ordered unsealed.

F.      On July 26, 2024, the Civil Action was transferred to the United States District Court for the Central District of California. It was re-captioned *United States Of America ex rel. Donald Johnson and Haedeuk Yae v. Chromologic LLC And Naresh Menon*, Case No. 2:24-cv-06749-PA-JPR (C.D. Cal.).

G.      On September 18, 2024, Predecessor Relators filed a First Amended Complaint ("FAC"), alleging that Defendants violated the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (B).

H.      In the Civil Action Relators contend that the Defendants:

i.      knowingly made and used, or caused to be made and used, false or fraudulent timesheets that were used to support invoices that Defendants submitted, or caused to be submitted, for payment by or approval of the United States for

**2 | P a g e**

payment in connection with ChromoLogic's performance of the Government Projects listed in Exhibit A;

ii.    knowingly presented, or caused to be presented, false or fraudulent research data or results in proposals and subsequent interim and final progress reports to the United States to obtain research contracts and awards or to obtain payment or approval of the United States for payment in connection with the Government Projects listed in Exhibit B;

iii.    knowingly presented, or caused to be presented, false or fraudulent proposals and subsequent interim and final progress reports to the United States to obtain research contracts and awards that falsely represented the commercial viability of the products and ChromoLogic's past history of commercialization to induce the United States to approve applications and to make payments to or approve payments in connection with the Government Projects listed in Exhibit B.

The Conduct described above in this paragraph H(i)-(iii) is referred to as the "Covered Conduct."

I.    On October 9, 2024, Defendants filed an Answer, denying the allegations asserted in the FAC. Defendants deny they violated the False Claims Act in connection with respect to the Covered Conduct.

J.    Predecessor Relator Haedeuk Yae field a Chapter 7 bankruptcy petition on November 18, 2024 in the bankruptcy case styled *In re Haedeuk Yae*, case 2:24-bk-19380- BR, in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), and Sam S. Leslie was appoint the chapter 7 trustee of the estate of Haedeuk Yae.

K.    On December 1, 2025, the District Court in the Civil Action ordered that Trustee be substituted as Plaintiff in the Civil Action for Predecessor Relator Haedeuk Yae.

L.     In December 2025, Johnson died. On February 2, 2026 Noelle Johnson, as representative of the Estate of Donald Johnson was ordered to be substituted for Predecessor Relator Donald Johnson (deceased).

M.     Relators, and their Predecessor Relators are, or have been, represented in the Civil Action by McInnis Law, Klein Rajaram Law and Cohen Seglias Pallas Greenhall & Furman, PC. (collectively, "Relators' Counsel").

N.     Relators claim entitlement to a share of the proceeds of this Agreement and to reasonable expenses, attorneys' fees, and costs under 31 U.S.C. § 3730(d).

O.     Relators  intend obtain the written consent of the United States to the terms of this Agreement and the dismissal of this Civil Action under the Terms and Conditions set out below.

P.     This Agreement and the fixing and payment of attorneys' fees and costs are all subject to approval of the Bankruptcy Court. The Trustee will file a motion to obtain an order from the Bankruptcy Court.

Q.     This Agreement is neither an admission of liability by Defendants nor a concession by Relators that their claims are not well founded.

R.     To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

## TERMS AND CONDITIONS

1.     Incorporation of Recitals: The forgoing recitals are incorporated in this Agreement and made a part hereof. The representations in the Recitals are a material inducement by the Parties to enter into this Agreement.

2.     <u>Conditions Precedent to Defendants' Payment of United States Settlement Amount and Fee Settlement Amount and filing Stipulation of Dismissal</u>. The Defendants' obligation to pay the United States Settlement Amount set forth in paragraph 3 below and to pay the Fee Settlement Amount set forth in paragraph 5 below, and the obligation to file the Stipulation of Dismissal set forth in paragraph 13 are expressly conditioned upon:

a.   The United States express written consent to this Agreement and the United States Agreement to Joint Stipulation of Dismissal attached as Exhibit C;

b.   A final, non-appealable order of the United States Bankruptcy Court approving this Settlement Agreement, including the fixing and payment of attorney's fees and costs;

c.   A final, non-appealable order of the United States District Court in the Civil Action approving this Settlement Agreement.

3.     <u>United States Settlement Amount Payment</u>. On or before five (5) business days following satisfaction of all conditions set forth in paragraph 2, Defendants shall pay to the United States of America, the sum of five hundred thousand dollars ($500,000) (the "Settlement Amount"), which constitutes restitution to the United States, according to the schedule set forth below. Interest on the Settlement Amount shall accrue at the rate set forth under 28 U.S.C. § 1961 upon execution of this Agreement. Payment of the Settlement Amount shall be by electronic funds transfer pursuant to written instructions provided by the United States and shall be made pursuant to the following payment schedule:

a.   $240,000.00 (TWO-HUNDRED AND FOURTY THOUSAND DOLLARS ONLY AND NO CENTS), plus interest, to the United States.

**5 | P a g e**

b. $150,000.00 (ONE-HUNDRED AND FIFTY THOUSAND DOLLARS ONLY AND NO CENTS), plus interest, to the United States on July 1, 2026 or as soon as the conditions set forth in paragraph 2 above are satisfied, whichever occurs last.

c. $110,000.00 (ONE-HUNDRED AND TEN THOUSAND DOLLARS ONLY AND NO CENTS), plus interest, to the United States on December 31, 2026.

4.  Relators' Share Agreement. Relators represent and warrant that they have entered into a separate Relators' Share Agreement with the United States to which, after the United States receives the Settlement Amount payments, Relators will receive a 28.5% share of the Settlement Amount payments, including any interest. Relators shall be solely responsible for any and all tax or related liabilities and costs that they may incur as a result of receiving their share of the Settlement Amount.

5.  Fee Settlement Amount. Upon satisfaction of the conditions set forth in paragraph 2 above, Defendants shall pay FOUR HUNDRED AND NINETY THOUSAND DOLLARS AND NO CENTS ($490,000) (the "Fee Amount") to Relators' Counsel, according to the schedule below, to resolve and settle any and all claims related to attorneys' fees, costs, and expenses, either already incurred or that may be incurred in the future in connection with the Civil Action and that Relators or Relators' Counsel have or may have under 31 U.S.C. § 3730(d)(2) or under any comparable statute; under any other law, regulation, or agreement; or at common law. Consistent with this Paragraph, Defendants shall make payment of the Fee Amount as set out below by electronic funds transfer pursuant to written instructions provided by McInnis Law. McInnis Law shall be responsible for submitting a W-9 Form to Defendants and for distributing the Fee Amount to Relators' Counsel. Relators' Counsel shall be solely responsible for any and all tax or related liabilities and costs that they may incur as a result of receiving the Fee Amount. The Fee Amount,

6 | P a g e

shall be considered as restitution and not the payment of a penalty and shall be made pursuant to the following payment schedule:

   a.  $160,000 (for attorneys' fees and costs) on July 1, 2027. No interest will be applied to this payment.

   b.  $165,000 (for attorneys' fees and costs) on January 1, 2028. No interest will be applied to this payment.

   c.  $165,000 (for attorneys' fees and costs) on July 1, 2028. No interest will be applied to this payment.

6.    <u>Relators Release</u>. Upon the United States' receipt of the Settlement Amount and Relators' Counsel's receipt of the Fee Amount, Relators, on behalf of themselves, their administrators, executors, trustees, representatives, heirs, estates, predecessors, successors, attorneys, agents, and assigns release Defendants, and to the extent a Defendant is a natural person, his administrators, executors, trustees, representatives, estate, heirs, predecessors, successors, attorneys, agents and assigns, and to the extent a Defendant is an entity, its successors, predecessors, current and former parent corporations, its direct and indirect subsidiaries, divisions, affiliated entities, owners, members, officers, directors, managers, employees, agents, and attorneys from any and all claims, causes of action, demands, obligations, rights, liabilities, damages, including actual, compensatory, punitive and statutory damages, statutory penalties, fees, costs or other relief of any kind whatsoever, at law or in equity, whether arising in contract, in tort, under statute or otherwise, whether known or unknown, asserted or unasserted that Relators or their Predecessor Relators have or could have had, through the Effective Date of this Agreement arising out of or related to the Predecessor Relators' employment with Chromologic, the facts and circumstances alleged in the Complaint, the Covered Conduct, and all claims arising out of or

related to the filing or prosecution of the Civil Action and any and all claims to fees and expenses pursuant to 31 U.S.C. § 3730(d)(2) related to the Civil Action.

7. Reasonableness of the Agreement. Relators, on behalf of themselves and on behalf of their estates, administrators, executors, trustees, representatives, heirs, predecessors, successors, attorneys, agents, and assigns, agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).

8. Relators Release of United States. Upon Relators' receipt of Fee Settlement Payment, Relators, on behalf of themselves and their estates, administrators, executors, trustees, representatives, heirs, predecessors, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, their agencies, officers, agents, employees, and servants, from any claims arising from the filing of this litigation or under 31 U.S.C. § 3730 and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

9. Defendants' Release of the United States. Upon entry of the Dismissal Order, Defendants fully and finally release the United States, and their agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Defendants have asserted, could have asserted, or may assert in the future against the United States, their agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation and prosecution thereof.

10. Defendants' Release of Relators. Defendants together with their current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; affiliate entities; owners, officers, directors, employees, agents, shareholders, and attorneys; and the heirs, representatives, successors, and assigns of any of them fully and finally release Relators, their current and former heirs, successors, attorneys, agents, and assigns from any and all claims,

whether in law or in equity, whether known or unknown (including attorneys' fees, costs, and expenses of every kind and however denominated) that Defendants have or may have through the Effective Date of this Agreement, including any and all claims Defendants have asserted, could have asserted, or may assert in the future against Relators related to any of the claims in Complaint or First Amended Complaint in the Civil Action and Relator's investigation and prosecution thereof. The Defendants waive any claim against the Bankruptcy Estate of Haedeuk Yae.

11.   Costs and Expenses. Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement, with the exception that Defendants shall pay the Fee Amount set forth in Paragraph 5 above.

12.   Intended Beneficiaries of this Agreement. This Agreement is intended to be for the benefit of the Parties, the released Parties, and the United States, only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraphs 6, 8, 9, and 10 above. All persons or entities released in paragraphs 6, 8, 9, and 10 above shall be entitled to enforce this Agreement's release provisions.

13.   Dismissal of the Civil Action. Within five (5) days following satisfaction of the conditions set forth in paragraph 2 above, Relators and Defendants will file with the Court a joint stipulation of dismissal of the Civil Action with prejudice as to Relators (in its entirety and consistent with the release described in Paragraph 6 above) and with prejudice to the United States as to the Covered Conduct, but otherwise without prejudice as to the United States. The joint stipulation will also specify that the dismissal applies to any claim by Relators for reasonable attorneys' fees and costs under 31 U.S.C. § 3730(d)(2). The form of the joint stipulation and proposed order for dismissal are attached as Exhibit C.

14.     United States' Reservation of Claims. Notwithstanding the releases given in Paragraph 8, of this Agreement, or any other terms of this Agreement, the following claims of the United States are specifically reserved and not released:

    a.  Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

    b.  Any criminal liability;

    c.  Any administrative liability or enforcement right;

    d.  Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

    e.  Any liability based upon obligations created by this Agreement;

    f.  Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

    g.  Any liability for failure to deliver goods or services due; and

    h.  Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

15.     Interpretation of Agreement. The Agreement shall be construed as a whole, according to the fair and common meaning of its terms and not be construed strictly for or against either of the Parties. This Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute. The headings are for reference only and shall not affect the meaning or interpretation of this Agreement.

16.     Choice of Law; Venue. This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Central District of California.

17.     Entire Agreement. This Agreement constitutes the complete agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral, written and other agreements, discussions, or understandings between or among the Parties with respect to the subject matter hereof. No statements, promises or inducements made by the Parties or their representatives, officers, managers, employees or agents which are not contained herein shall be valid or binding on a Party hereto. In entering this Agreement, each Party conducted their own investigation of the claims and defenses asserted in the Civil Action and no Party relied upon any representation (other than the representations set forth in this Agreement) by any other Party and instead, each Party is relying on its own investigation in deciding to enter into this Agreement.

18.     Amendment. This Agreement may not be modified or amended except by written consent of the Parties.

19.     Authorization to Enter into the Agreement. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

20.     Execution in Counterparts. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement. Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

21.     Effective Date of this Agreement. This Agreement is effective on the date of the last signatory to the Agreement (Effective Date of this Agreement), and upon satisfaction of all the conditions precedent set forth in paragraph 2 above.

SIGNATURE PAGES (pages 12 and 13) TO THE SETTLEMENT AGREEMENT:

_____     Dated:  03/05/2026
Noelle Johnson (Mar 5, 2026 14:51:00 PST)
**Noelle Johnson, the representative of the Estate of Donald Johnson, deceased**

_____     Dated:  03/  /2026
**Sam S. Leslie, Chapter 7 Trustee of the Bankruptcy Estate of Haedeuk Yae**

_____     Dated: 03/   /2026
**NARESH MENON**

**CHROMOLOGIC, LLC**

By:_____

Its: _____

Dated:  03/  /2026

**12 | P a g e**

SIGNATURE PAGES (pages 12 and 13) TO THE SETTLEMENT AGREEMENT:

_____   Dated:  03/  /2026
Noelle Johnson, the representative of the Estate of Donald Johnson, deceased

_____   Dated:  03/ 6/2026
Sam S. Leslie, Chapter 7 Trustee of the Bankruptcy Estate of Haedeuk Yae

_____   Dated:  03/  /2026
NARESH MENON

CHROMOLOGIC, LLC

By:_____

Its: _____

Dated:  03/  /2026

12 | P a g e

SIGNATURE PAGES (pages 12 and 13) TO THE SETTLEMENT AGREEMENT:

_____ Dated:  03/  /2026
**Noelle Johnson, the representative of the Estate of Donald Johnson, deceased**

_____ Dated:  03/  /2026
**Sam S. Leslie, Chapter 7 Trustee of the Bankruptcy Estate of Haedeuk Yae**

_____ Dated: 03/10/2026
**NARESH MENON**

**CHROMOLOGIC, LLC**

By: _____

Its: _____CEO_____

Dated:  03/  /2026

12 | P a g e

**Menon Family Trust**

The following Trustees of the Menon Family Trust, dated August 6, 2016, sign below solely for the purpose of guaranteeing on behalf of the Trust only the payment of the United States Settlement Amount set forth in paragraph 3 herein and the Fee Settlement Amount set forth in paragraph 5 herein, upon satisfaction of the conditions set forth in paragraph 2 herein:

Dated: 03/10/2026

**Naresh Menon, Trustee of the Menon Family Trust, dated August 6, 2016**

**Shinjini Menon, Trustee of the Menon Family Trust, dated August 6, 2016**

13 | P a g e

**EXHIBIT A**

| CL Project Name | Government Contract Number |
|---|---|
| Cimosa | FA865013M5024 |
| LRC-DP-BAA; LRC-DP-STTR | 75N93021C00008; 5R41AI157357 |
| Midos | HHSN272201700012C; 75N93023C00016 |
| Ocosmo | W911QY14C0003 |
| Ocdos | HHSO100201000005C |
| RDB | W911NF09C0050 |
| CM-OCT | N6833523C0213 |
| MC-CAM | N6833524C0041 |
| OPSat | HQ014714C8020 |
| Phytr | N6833515C0046 |
| QuanTek | HQ014714C7003; HQ01419C7120 |
| SPINNMO II | N6833522C0487 |
| Theraspec | W81XWH15C0127 |

**EXHIBIT B**

| CL Project Name | Contract Number |
|---|---|
| AMeFE I | W911SR-21-C-0036 |
| ARIA I | N43CO110047 |
| ArtRet I | W81XWH-12-C-0100 |
| ArtRet II | W81XWH-12-C-0100 |
| AWAPad I | W81XWH19C0135 |
| BAID I | W81XWH-18-C-0011 |
| BAID II | W81XWH-19-C-0066 |
| BICER I | HHSN272201500020C |
| BioFLEX I | W31P4Q-13-C-0061 |
| BioSAP I | NNX12CD38P |
| BIO-VOTO I | 1R43ES025526-01 |
| CAPTIN-D | 75N93023C00057 |
| CEMPOG | W81XWH21P0118 |
| Cempog, Phase II | W81XWH22C0120 |
| CereTRec I | W81XWH-17-C-0221 |
| Ceretrec II | W81XWH18C0358 |
| Cimosa I | FA8650-13-M-5044 |
| Cimosa II | FA8650-14-C-5024 |
| CM-OCT I | W81XWH18C0354 |
| CM-OCT II | W81XWH19C0081 |
| CM-OCT IIE | N6833523C0213 |
| COH | W81XWH0810517 |
| DAVANIS I | W81XWH-10-C-0001 |
| DAVANIS II | W81XWH-10-C-0001 |
| DESML I | FA8651-15-M-0221 |
| ECMO I | W911NF-14-C-0037 |
| E-OCT I | W81XWH20P0005 |
| EyePath | 1R43EY033266-01A1 |
| EyePath II | 2R42EY033266-02 |
| FitReadi | W56KGU-21-C-0038 |
| Flocop I | W81XWH-15-C-0131 |
| Flocop II | W81XWH-17-C-0010 |
| FPS I | NNX10CE42P |
| FPS II | NNX11CB42C |
| HiFiDe I | HHSN261201700043C |
| H-LET JP4-039-MLV I | 80NSSC21C0146 |
| Imprint I | W81XWH-12-C-0002 |
| Imprint II | W81XWH-12-C-0002 |
| JP4-039-MLV I | W81XWH21P0091 |
| JP4-039-MLV II | W81XWH22C0096 |
| LC-TAPS | 75N93024C00032 |
| LIBA I | DE-SC0000754 |
| LRC-DP BAA | 75N93021C00008 |

| CL Project Name | Contract Number |
|---|---|
| LRC-DP STTR | 1R41AI157357-01 / 5R41AI157357-02 |
| Magtat I | W81XWH-16-C-0181 |
| MAWED | W912CG25P0001 |
| MC-CAM | N6833523C0086 |
| MC-CAM II | N6833524C0041 |
| MEDSEM I | NNX15CP69P |
| MEDSEM II | NNX16CP81C |
| MeSS I | N68335-20-C-0552 |
| MGEAS | 80NSSC23PB380 |
| MGEAS II | 80NSSC24CA152 |
| Midos | HHSN272201700012C |
| Midos 2.0 | 75N93023C00016 |
| MiRAD I | 1R43AI1080019-01A1 / 5R43AI108019-02 |
| MiRAD II | 2R44AI108019-03 / 5R44AI108019-04 / 5R44AI108019-05 |
| Miva-Cap | W911SR22P0002 |
| NOCT | W81XWH22P0063 |
| Ocdos | HHSO100201000005C |
| OCHYMO I | W81XWH-08-C-0021 |
| OCHYMO II | W911QY12C0017 |
| Ocosmo I | W911QY-13-P-0005 |
| Ocosmo II | W911QY-14-C-0003 |
| OCTOPUS I | FA8224-09-C-0033 |
| Ofam I | 1R43EY022548-01 |
| Ofam II | 2R44EY022548-02A1 / 5R44EY022548-03 |
| OPPAH I | W81XWH19C0001 |
| Opsat | HQ014714C8020 |
| OPTINAS I | W81XWH-12-C-0044 |
| ORB | HHSN261201100047C |
| ORIENT I | N68335-16-C-0498 |
| PANGS I | W911NF-20-P-0069 |
| PHYTR I | N68335-14-C-0065 |
| PHYTR II | N68335-15-C-0046 |
| PRIAM I | DE-SC00006234 |
| Quantek E3-II | HQ0147-19-C-7120 |
| Quantek I | HQ0147-13-C-7310 |
| Quantek II | HQ0147-14-C-7003 |
| QuickMag I | 75N93019C00025 |
| QuickMag II | 75N93021C00031 |
| Rapidos | FA701410C0010 |
| RAPSTEC I | HQ072720P0009 |
| RAPSTEC II | HQ072721C0004 |
| RAPSTEC IIE | HQ072724C1001 |
| RDB I | W911NF-08-C-0013 |

| CL Project Name | Contract Number |
|---|---|
| RDB II | W911NF-09-C-0050 |
| ReSeal I | N00014-10-M-0033 |
| SpiNNMo I | N68335-21-C-0109 |
| SPINNMO II | N6833522C0487 |
| ST-CoDI I | 75D30119P06307 |
| SuperFLEX I | 200-2013-M-56461 |
| SYNFACT I | W81XWH-17-C-0197 |
| Synfact II | W81XWH18C0094 |
| SynGen I | D16PC00157 |
| THERASPEC I | W81XWH-14-C-0010 |
| THERASPEC II | W81XWH-15-C-0127 |
| UCLA - | 1670GXB972 |
| Unitrac | SP470117C0049 |
| UPMC | AWD00007553 (137245-1) |
| UWAS I | N68335-18-C-0736 |
| WHERA | W5170123C0086 |

## EXHIBIT C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
*ex rel.* NOELLE JOHNSON, THE
REPRESENTATIVE OF THE
ESTATE OF DONALD JOHNSON
and
SAM S. LESLIE, CHAPTER 7
TRUSTEE OF THE BANKRUPTCY
ESTATE OF HAEDEUK YAE,

      Plaintiffs,     Case No.: 2:24-cv-06749-PA-JPR

  v.

CHROMOLOGIC LLC and
NARESH MENON,

      Defendants.

## JOINT STIPULATION OF DISMISSAL

Plaintiffs-Relators Noelle Johnson, the representative of the Estate of Donald Johnson and Sam S. Leslie, Chapter 7 Trustee of the Bankruptcy Estate of Haedeuk Yae (jointly, "Relators"), and Defendants Chromologic LLC and Naresh Menon (jointly, "Defendants"), through their counsel, submit this Joint Stipulation of dismissal pursuant to the terms of a settlement agreement effective [DATE], 2026 between the Relators and Defendants (the "Settlement Agreement"). Relators and Defendants are collectively referred to herein as the "Parties."

On August 5, 2021, predecessor Relators Donald Johnson and Haedeuk Yae (jointly, "Predecessor Relators") filed this action in the United States District Court for the District of Columbia, pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b) (Dkt. No. 1) ("the Civil Action"). On May 30, 2023, the Government, through the U.S. Attorney's Office for the District of Columbia, filed a notice of non-intervention and, on June 16, 2023, the matter was ordered unsealed. On July 26, 2024, the Civil Action was transferred to the United States District Court for the Central District of California. (Dkt. No. 28). It was re-captioned *United States Of America ex rel. Donald Johnson and Haedeuk Yae v. Chromologic LLC And Naresh Menon*, Case No. 2:24-cv-06749-PA-JPR (C.D. Cal.). On September 18, 2024, Relators filed a First Amended Complaint ("FAC"). (Dkt. No. 48). On October 9, 2024, Defendants filed an Answer, denying the allegations asserted in the FAC. (Dkt. No. 51). On December 1, 2025, Bankruptcy Trustee Sam Leslie was ordered to be substituted for Predecessor Relator Haedeuk Yae. (Dkt. No. 127). On February 2, 2026, Noelle Johnson, as representative of the Estate of Donald Johnson was ordered to be substituted for Predecessor Relator Donald Johnson (deceased). (Dkt. No. 135).

The Settlement Agreement compromises and resolves all claims and causes of action in the Civil Action. Additionally, the Settlement Agreement compromises and resolves any claims and causes of action that Relators and Predecessor Relators

have for expenses, costs and attorneys' fees pursuant to the FCA, 31 U.S.C.. § 3730(d)(2).

The United States, through the United States Attorney's Office for the Central District of California, has approved the terms of the Settlement Agreement and has consented in writing to the dismissal of the Civil Action.

The United States Bankruptcy Court has approved the terms of the Settlement Agreement.

The United States District Court for the Central District of California must approve the Settlement Agreement and dismissal of the Civil Action for it to become effective.

Accordingly, pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure and 31 U.S.C. § 3730(b)(1) of the FCA, and in accordance with the terms and conditions of the Settlement Agreement, the Parties hereby jointly stipulate to the dismissal of the Civil Action.

The dismissal shall be with prejudice as to Relators. With respect to the United States, the dismissal of the Civil Action shall be with prejudice with respect to the claim asserted by Relators against the Defendants for the following Government Dismissed Conduct:

Defendants knowingly made and used, or caused to be made and used, false or fraudulent timesheets that were used to support invoices that Defendants submitted, or caused to be submitted, for payment by or approval of the United States for payment in

connection with ChromoLogic's performance of the Government
Projects listed in Exhibit 1.

The dismissal of this Civil Action is without prejudice to the United States for

the Covered Conduct as defined in the Settlement Agreement that is not expressly

set forth herein.

A proposed order accompanies this notice.

Dated: [DATE], 2026

Respectfully submitted,

KLEIMAN RAJARAM

By:

_____

Pooja Rajaram (SBN 241777)
12121 Wilshire Blvd., Ste. 810
Los Angeles, CA 90025
310-392-5455
pooja@krlaw.us

Attorneys for Plaintiffs

O'HAGAN MEYER, PLLC

By:

_____

MICHAEL I. KESSLER
O'Hagan Meyer, PLLC
21650 Oxnard Street, Suite 530
Woodland Hills, CA 91367
213-306-1610
Fax: 213-306-1615
Mkessler@ohaganmeyer.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
*ex rel.* NOELLE JOHNSON, THE
REPRESENTATIVE OF THE
ESTATE OF DONALD JOHNSON
and
SAM S. LESLIE, CHAPTER 7
TRUSTEE OF THE BANKRUPTCY
ESTATE OF HAEDEUK YAE,

               Plaintiffs,        Case No.: 2:24-cv-06749-PA-JPR

     v.

CHROMOLOGIC LLC and
NARESH MENON,

               Defendants.

## [PROPOSED] ORDER GRANTING JOINT STIPULATION OF DISMISSAL

Upon consideration of the Joint Stipulation of Dismissal filed by Plaintiffs-Relators Noelle Johnson, the Representative of the Estate of Donald Johnson and Sam S. Leslie, Chapter 7 Trustee of the Bankruptcy Estate of Haedeuk Yae (jointly, Relators), and Defendants Chromologic LLC and Naresh Menon, it is hereby:

ORDERED that this action is dismissed in its entirety pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure and 31 U.S.C. § 3730(b)(1) of

the False Claims Act. Pursuant to and consistent with the terms of the Settlement

Agreement among the parties, effective [], 2026, (hereinafter "Settlement

Agreement"), the dismissal shall be with prejudice as to Relators, with prejudice as

to the United States for the following Government Dismissed Conduct:

> Defendants knowingly made and used, or caused to be made and used, false or fraudulent timesheets that were used to support invoices that Defendants submitted, or caused to be submitted, for payment by or approval of the United States for payment in connection with ChromoLogic's performance of the Government Projects listed in Exhibit 1.

The dismissal of this Civil Action is without prejudice to the United States for

the Covered Conduct as defined in the Settlement Agreement that is not expressly

set forth herein.

IT IS SO ORDERED.

Hon. Percy Anderson
United States District Judge

Dated: _____

**EXHIBIT 1**

| ChromoLogic Project Name | Government Contract Number |
|---|---|
| Ocosmo | W911QY14C003 |
| Theraspec | W81XWH15C0127 |
| Cimsosa | FA865013M5024 |
| Midos | HHSN272201700012C; 75N93023C00016 |
| OPSAT | HQ014714C8020 |
| Quantek | HQ014714C7003;HQ01419C7120 |

# EXHIBIT "2"

Debtor 1 ___Haedeuk Yae_____ Case number *(if known)* _____

**27. Licenses, franchises, and other general intangibles**
   *Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
   ☐ No
   ☒ Yes.   Give specific information about them...

   | | |
   |---|---|
   | Debtor is a Co-relator in Lawsuit in DC district along with Donald Johnson and has an agreement of 50% to any recovery from the claim . See claim below listed against Chromologic LLC value not known could be in the Millions, Any settlement is Dependent on US Gov Approval, claiming all available exemption see below. | $10,000,000.00 |

---

**Money or property owed to you?**

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

**28. Tax refunds owed to you**
   ☒ No
   ☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

**29. Family support**
   *Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
   ☒ No
   ☐ Yes. Give specific information......

**30. Other amounts someone owes you**
   *Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,   workers' compensation, Social Security benefits; unpaid loans you made to someone else
   ☒ No
   ☐ Yes.   Give specific information..

**31. Interests in insurance policies**
   *Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
   ☒ No
   ☐ Yes. Name the insurance company of each policy and list its value.
   Company name:                Beneficiary:                Surrender or refund value:

**32. Any interest in property that is due you from someone who has died**
   If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
   ☒ No
   ☐ Yes.   Give specific information..

**33. Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
   *Examples:* Accidents, employment disputes, insurance claims, or rights to sue
   ☐ No
   ☒ Yes.   Describe each claim.........

   | | |
   |---|---|
   | Lawsuit in DC district as a relator on behalf of United States against Chromologic LLC value not known could be in the Millions, Any settlement is Dependent on US Gov Approval, claiming all available exemption of $23,050 | $10,000,000.00 |

**34. Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
   ☒ No
   ☐ Yes.   Describe each claim.........

**35. Any financial assets you did not already list**
   ☒ No
   ☐ Yes.   Give specific information..

**36. Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here.................................................................................................................**   $20,084,100.00

**Part 5:**   **Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.**

Official Form 106A/B                Schedule A/B: Property                page 4

Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | Haedeuk Yae | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the:    CENTRAL DISTRICT OF CALIFORNIA

Case number
(if known)

☐ Check if this is an
amended filing

## Official Form 106C

# Schedule C: The Property You Claim as Exempt

**4/22**

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.**

| Part 1: | Identify the Property You Claim as Exempt |
|---|---|

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   ☒ You are claiming state and federal nonbankruptcy exemptions.     11 U.S.C. § 522(b)(3)

   ☐ You are claiming federal exemptions.     11 U.S.C. § 522(b)(2)

2. **For any property you list on *Schedule A/B* that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | | Specific laws that allow exemption |
|---|---|---|---|---|
| 2016 Volvo XC90 100000 miles<br>Line from *Schedule A/B*: 3.1 | $14,000.00 | ☒ | $7,500.00 | C.C.P. § 703.140(b)(2) |
| | | ☐ | 100% of fair market value, up to any applicable statutory limit | |
| 2016 Volvo XC90 100000 miles<br>Line from *Schedule A/B*: 3.1 | $14,000.00 | ☒ | $6,500.00 | C.C.P. § 703.140(b)(5) |
| | | ☐ | 100% of fair market value, up to any applicable statutory limit | |
| Household furnishings<br>Line from *Schedule A/B*: 6.1 | $2,000.00 | ☒ | $2,000.00 | C.C.P. § 703.140(b)(3) |
| | | ☐ | 100% of fair market value, up to any applicable statutory limit | |
| personal electronics<br>Line from *Schedule A/B*: 7.1 | $1,000.00 | ☒ | $1,000.00 | C.C.P. § 703.140(b)(3) |
| | | ☐ | 100% of fair market value, up to any applicable statutory limit | |
| clothing<br>Line from *Schedule A/B*: 11.1 | $400.00 | ☒ | $400.00 | C.C.P. § 703.140(b)(3) |
| | | ☐ | 100% of fair market value, up to any applicable statutory limit | |

Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

# EXHIBIT "3"

McINNIS LAW
Timothy J. McInnis [7151]
*(pro hac vice)*
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel:(212) 292-4573
Fax: (212) 292-4574
Email: tmcinnis@mcinnis-law.com

Mark Allen Kleiman [115919]
KLEIMAN RAJARAM
12121 Wilshire Blvd., Ste. 810
Los Angeles, CA 90025
Telephone: (310) 392-5455
Facsimile:  (310) 306-8491
E-mail: mark@krlaw.us

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DONALD JOHNSON and HAEDEUK YAE, <br><br> Plaintiffs, <br><br> v. <br><br> CHROMOLOGIC LLC and NARESH MENON, <br><br> Defendants. | ) Case No.:  2:24-cv-06749-PA-JPR <br> ) <br> ) FIRST AMENDED COMPLAINT <br> ) AND DEMAND FOR JURY TRIAL <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

1

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

## OVERVIEW OF ALLEGATIONS[1]

1. This is a civil action by DONALD JOHNSON ("JOHNSON") and HAEDEUK YAE ("YAE") (jointly, "RELATORS"), each on his own behalf, and on behalf of the United States of America ("UNITED STATES") against defendants CHROMOLOGIC LLC ("CHROMOLOGIC") and its owner and chief executive officer NARESH MENON ("MENON") (jointly, "DEFENDANTS") under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), for treble damages, civil penalties, and other relief arising from DEFENDANTS' fraudulent conduct in connection with CHROMOLOGIC's improper claims for, and receipt and retention of, monetary payments from, the United States.

2. DEFENDANTS' alleged fraudulent practices arose through their participation in the Small Business Innovation Research ("SBIR") Program, operated by the Small Business Administration ("SBA"), pursuant to 15 U.S.C. § 638, as well as awards pursuant to Broad Agency Announcements ("BAAs"), administered by the United States through four of its funding agencies: the Department of Defense ("DOD"), the Department of Health and Human Services ("HHS")/National Institutes of Health ("NIH"), the National Aeronautics and Space Administration ("NASA") and the Department of Energy ("DOE").

3. Specifically, as claimed in Counts I and II, through MENON and other employees, CHROMOLOGIC, committed research fraud by submitting to the Government false and fraudulent SBIR grant applications (also known as "proposals") and subsequent interim and final progress reports and other supporting materials, as well as by making *ad hoc* false oral statements to funding agency representatives ("Research Fraud").

4. Similarly, as claimed in Count III and IV, through MENON and other employees, CHROMOLOGIC committed time accounting fraud by submitting to the Government false and fraudulent timesheets, certifications, records and reports, as well as

---

[1] The headings in this complaint are merely for organizational convenience. They are not themselves allegations. Further, all allegations under a particular heading may be incorporated and realleged in other sections where appropriate.

2

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

making false *ad hoc* oral statements to funding agency representatives ("Timesheet Fraud").4

5. As a result of the Research Fraud and Timesheet Fraud activities and practices alleged in this complaint, MENON and CHROMOLOGIC improperly and unlawfully sought, received and retained funds from the United States through the SBIR Program and the BAAs, the precise amount of which will be determined at trial.

**PARTIES, PERSONS AND ENTITIES**

6. The United States, through its affected agencies, the SBA, DOD, HHS/NIH, NASA and DOE, is the real party in interest in this *qui tam* action.

7. The headquarters of the affected agencies are all located in the District of Columbia at the following addresses: SBA, 409 Third Street, SW, Washington, D.C. 20416; DOD, 1400 Defense Pentagon, Washington, D.C. 20301-1400; HHS/NIH, 200 Independence Avenue S.W. Washington, D.C., 2020; NASA, 300 Hidden Figures Way, SW, Washington, D.C.; and DOE, 1000 Independence Avenue, SW, Washington, D.C. 20210.

8. RELATOR JOHNSON is a natural person who currently resides in the State of California. Johnson holds a Ph.D. in Chemistry, which he obtained from University of California, San Diego. From September 2016 to March 2019, JOHNSON was a lead scientist at CHROMOLOGIC. In that capacity, JOHNSON worked directly on many of the projects for which CHROMOLOGIC sought SBIR funding. More specifically, JOHNSON served at times as a principal investigator ("PI"), support scientist to other PIs, and reviewer of other employees' grant applications and research reports. JOHNSON was directly involved in each of the specific SBIR-awarded grant contracts cited in this complaint as examples of DEFENDANTS' Research Fraud activities, including personally making false statements in progress reports filed with awarding agencies. Additionally, at times, JOHNSON falsified timesheets for SBIR grant awards and contracts. All of the foregoing was at the express direction of MENON and/or other CHROMOLOGIC

//

3

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

employees who, in turn, were acting at the behest of MENON and/or other CHROMOLOGIC supervisors, managers and executives.

9. RELATOR YAE, who goes by the first name "Robert," is a natural person who currently resides in the State of California. YAE holds a B.A. in Computer Science and an M.S. in Medical Computer Science. From 2015 to 2021, Yae was the principal software engineer at CHROMOLOGIC. In that capacity he performed a number of functions, including principal software engineer, facilities manager, IT manager, and assistant to security/safety officer. YAE was involved in some of the Timesheet Fraud activities alleged in this complaint. Among other things, YAE falsified timesheets for SBIR grant awards and contracts. He did so at the behest of MENON and/or other CHROMOLOGIC supervisors, managers and executives.

10. DEFENDANT CHROMOLOGIC, founded in 2003, is a limited liability company organized under the laws of the State of California. Its principal place of business is 1225 S. Shamrock Avenue, Monrovia, California 91016. Its main telephone number is (626) 381-9974. CHROMOLOGIC is organized into two units: the Biomedical Solutions Group and the Industrial Solutions Group. Its business consists primarily in obtaining research grant awards and contracts from the United States SBIR Program and performing related research in a laboratory setting. Approximately, 95% of CHROMOLOGIC's revenues come from SBIR awards and contracts. Since 2007, CHROMOLOGIC has been awarded at least 82 SBIR grant contracts. See SBIR.gov.[2] CHROMOLOGIC typically employs approximately between 35 and 45 people at any given time, approximately 85% of whom are research scientists who serve very short tenures (averaging two years or less) with the company. The majority of CHROMOLOGIC'S scientists are non-U.S. citizens who toil under MENON's pressure and sway because of their foreign alien status. CHROMOLOGIC's Unique Entity I identifier ("UEI") for doing business with the Government is D9EVNTKKWLF3.

---

[2] These include SBIR Phase I and Phase II awards from the following funding agencies: HHS (NIH and CDC); DOD (Army, Missile Defense, Navy, USAF, DHA, DARPA, DLA ), NASA

4

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

11. DEFENDANT MENON is a natural person who resides at 887 Monarch Dr, La Canada Flintridge, CA 91011-4105, and is the daily manager, chief executive officer and sole or principal owner of CHROMOLOGIC. According to biographical information submitted in connection with SBIR grant applications, MENON holds a Ph.D. in Physics from Purdue University and served as a visiting fellow at Cornell University for four years. MENON was personally and actively engaged in the Research Fraud and Timesheet Fraud misconduct alleged in this Complaint. Additionally, he oversaw and directed the improper and unlawful activities of other CHROMOLOGIC employees who engaged in these fraudulent schemes.

12. At all times relevant to this action, non-party Claude J. Rogers ("Rogers") was the Director of the Biomedical Solutions Group at Chromologic. In that capacity he oversaw and participated in all SBIR-related research activities and the preparation of all government submissions. Rogers was Menon's right-hand man and eyes, ears and mouthpiece when it came to all SBIR awards and contracts in the Biomedical Solutions Group, including the specific SBIR awards and contracts cited in this complaint and the Research Fraud that occurred on them.

13. At all times relevant to this action, non-party Jim Axtelle ("Axtelle") was the Vice President of Operations at Chromologic. In that capacity he managed all SBIR research projects and oversaw the creation, storage and transmission of all related documentation, including proposals, progress reports, invoices and timesheets.

14. At all times relevant to this action, non-party Theresa Nguyen ("Nguyen") was Vice President of Finance and Administration at Chromologic. In that capacity she was Menon's trusted assistant and was ultimately responsible for, among other things, creating the fraudulent timesheets at issue in this complaint.

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction over the FCA claims alleged in this complaint under 28 U.S.C. §§ 1331 (federal question) and 31 U.S.C. § 3732(a) (False Claims Act).

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

16. The Court has personal jurisdiction over each Defendant pursuant to 31 U.S.C. § 3732(a) because an act proscribed by 31 U.S.C. § 3729 occurred in this District. 3732(a) further provides for service of process at any place within or outside the United States.

17. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because an act proscribed by 31 U.S.C. § 3729 occurred within this District; and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this District.

18. This action was originally commenced in the United States District Court for the District of Columbia. Docket No. 1:21-cv-02184-RJL. That court had personal jurisdiction over each Defendant under 31 U.S.C. § 3732(a) because an act proscribed by 31 U.S.C. § 3729 occurred in the District of Columbia. Venue was proper in the District of Columbia under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because an act proscribed by 31 U.S.C. § 3729 occurred within that district; and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in that district.

19. This action was transferred to this District pursuant to a court order effectuating a stipulation among all parties under 28 U.S.C. § 1404(a) consenting to voluntarily transfer venue to this District.

## FCA SUBJECT MATTER JURISDICTION AND BARS

20. None of the subject matter or other jurisdictional bars set forth in the FCA is applicable to this action, including, but not limited to: the first-to-file bar (31 U.S.C. § 3730(b)(5)); relator culpability bar (31 U.S.C. § 3730 (d)(3)); prior Government action bar (31 U.S.C. § 3730(e)(3)); public disclosure bar (31 U.S.C. § 3730(e)(4)); and statute of limitations (31 U.S.C. § 3731(b)).

21. Prior to any arguable "public disclosure" (as defined by the FCA, 31 U.S.C. § 3730(e)(4)(A)), RELATORS and/or their counsel voluntarily disclosed to the United States Attorney's Office for the District of Columbia (beginning at least as early as August 4,

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

2021)[3], and/or the United States Attorney's Office for the Central District of California (beginning at least as early as August 28, 2019) [4], the information upon which the allegations or transactions in this complaint are based, within the meaning of the FCA, 31 U.S.C. § 3730(e)(4)(B)(i).

22. Prior to filing this action, Relators voluntarily disclosed to the United States Attorney's Office for the District of Columbia (beginning at least as early as August 4, 2021), and/or the United States Attorney's Office for the Central District of California (beginning at least as early as August 28, 2019), the information on which the allegations or transactions in this complaint are based, within the meaning of the FCA, 31 U.S.C. § 3730(e)(4)(B)(2).

23. Because of the independent knowledge they acquired during their employment at CHROMOLOGIC and compliance with the prefiling disclosure requirements of the FCA, each RELATOR is an "original source" of the information on which these allegations are based, within the meaning of the FCA, 31 U.S.C. § 3730(e)(4)(B)).

## THE FALSE CLAIMS ACT

24. The FCA was originally enacted during the Civil War to combat rampant defense contracting fraud against the Government.

25. It is intended to reach all types of non-IRS fraud, without qualification, that might result in financial loss to the Government.

26. To serve its intended purpose, the FCA includes so-called "*qui tam*" provisions allowing private parties (known as "relators") to initiate and pursue claims where the United States and its tax payers have been defrauded -- even when, as here, the Government declines to intervene in the matter.

//

[3] The U.S. Attorney's Office for the District of Columbia declined to intervene in this action.

[4] Relator Johnson filed an action in this Court on January 6, 2020 alleging that Defendants violated the FCA by engaging in the Research Fraud activities alleged in this complaint. Docket No. CV20-00130 (SDF)(SSx). Johnson voluntarily dismissed his prior action in this District without prejudice after the U.S. Attorney's Office for the Central District of California declined to intervene in the matter.

7

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

27. Since its enactment, the FCA has become the primary vehicle the Government uses for recouping losses suffered through fraud.

28. Such recoveries have amounted to more than $72 billion since the FCA was amended and strengthened in 1986.

29. The majority of these FCA recoveries have come from *qui tam* lawsuits filed by private persons acting on behalf of the United States.

## FCA LIABILITY, DAMAGES, PENALTIES AND AWARDS

30. Any person who, among other things, (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410) (now set as a minimum of $13,946 and a maximum of $27,894, plus three (3) times the amount of damages which the Government sustained because of the act of that person. See 31 U.S.C. §§ 3729(a)(1) ("False Claims Liability") and (2) ("False Statements Liability").

31. Where the Government proceeds with an action initiated by the filing of a *qui tam* complaint and recovers money from a defendant under § 3729, the relator who initiated the action may receive up to twenty-five percent (25%) of the proceeds. Where, as here, the Government does not proceed with such an action and the relator pursues it on his/her own and recovers proceeds from a defendant under § 3729, the relator may receive up to thirty percent (30%) of the proceeds.

32. In either case, the relator is also entitled to an award against the defendant for the amount of all reasonable expenses, attorneys' fees and costs. 31 U.S.C. § 3730(d).

## RELEVANT FCA DEFINITIONS

33. For purposes of the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

disregard of the truth or falsity of the information, *and no proof of specific intent to defraud is required.* 31 U.S.C. § 3729(b)(1) (emphasis added). See also *United States ex rel. Schutte v. Supervalu Inc.*, 598 U.S. 739 (2023) (interpreting the terms "knowing" and "knowingly).

34. For purposes of the FCA, the term "claim" means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that — is presented to an officer, employee, or agent of the United States; or is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government — provides or has provided any portion of the money or property requested or demanded; or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2).

35. For purposes of the FCA, the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4). See also *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) (interpreting the term "material").

## FCA STATUTE OF LIMITATIONS

36. Under the FCA, a civil action under section 3730 may not be brought — more than 6 years after the date on which the violation of section 3729 is committed, or more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last. 31 U.S.C. § 3731(b).

## THE SBA'S SBIR PROGRAM

### Program Overview

37. On July 30, 1953, Congress created the SBA through enactment of the Small Business Act, 15 U.S.C. § 632.

//

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

38. Congress created the SBA's SBIR Program through the Small Business Innovation Development Act of 1982, 15 U.S.C. § 638(a) ("SBIR Act"). It has been reauthorized a number of times since.

39. Together with the Small Business Technology Transfer ("STTR") Program, and jointly comprising, "America's Seed Fund," the SBIR Program's purpose is to support small research businesses, stimulate private sector innovation and entrepreneurship, and promote free competition in the research and development ("R&D") industry.

40. More specifically, the goal of the SBIR Program is to provide the Government with new and cost effective solutions to complex scientific and technical problems, while also encouraging small businesses to market such technology in the private sector, thereby helping to stimulate the United States economy and labor market.

41. The SBIR Act establishes a system for channeling federal monies to for-profit small businesses engaged in scientific and/or engineering research or research and development. The goal is for these small businesses to take seed money from the Government and develop useful technology that ultimately can be sold by the small businesses in the market place for a significant profit.

42. Under the SBIR Program, federal agencies with extramural R&D budgets over $100 million are required to administer SBIR Programs using an annual set-aside of 3.2% (since FY 2017). 15 U.S.C. § 638(f).

43. Currently, SBIR Program solicitations are awarded by eleven Government funding agencies, namely, the Department of Agriculture, the Department of Commerce, the Department of Defense, the Department of Education, the Department of Energy, the Department of Health and Human Services, the Department of Homeland Security, the Department of Transportation, the Environmental Protection Agency, the National Aeronautics and Space Administration, and the National Science Foundation.

44. The SBIR Act provides that each funding agency is to distribute SBIR funds to small business concerns by unilaterally: (1) determining suitable projects and research topics within its SBIR Program, (2) issuing small business innovation research

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

solicitations, (3) receiving and evaluating proposals, and (4) awarding grants to qualified participants. 15 U.S.C. § 638(g).

45. The actual payment of grant monies to an awardee/recipient is accomplished via a "funding agreement" between the awarding agency and the small business. 15 U.S.C. §§ 638(e)(3) and (g)(4)-(7). The funding agreement may be in the form of a contract, grant or cooperative agreement entered into between the funding agency and the small business.

46. Among other things, the funding agreement sets out a schedule for the distribution of funding, which is tied to the achievement of certain performance milestones. 15 U.S.C. § 638(g)(7).

47. Approximately $2.5 billion is dispersed annually for research grants awarded under the SBIR Program.

## SBIR Award Phases

48. The SBIR Program comprises three distinct developmental phases. Phase I is commonly thought of as the "technology feasibility" phase. Phase II is the "demonstration and evaluation of commercial potential" phase. And, Phase III is the "transition to market place" phase.

49. Phases I and II are initiated by the submission of "proposals" (also known as "grant applications") in response to funding agency "solicitations."

50. SBIR solicitations are released quarterly on-line, with the first quarter publication showcasing the funding agencies' R&D interests for the year.

51. One cannot obtain SBIR Phase I funds without first submitting a Phase I proposal. Likewise, one cannot obtain SBIR Phase II funds without first submitting a Phase II proposal. In either case the funding agencies rely on the information in the small businesses' proposals, which representations must be true, accurate and correct and are so certified.

52. Phase I grants and contracts are awarded to recipients based on the technical merit feasibility and commercial potential of their proposed R&D efforts as described in a Phase I grant proposal.

11
**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

53. Currently, Phase I grants and contracts are awarded in amounts up to $306,872 per grant or contract, although the amount was substantially lower during the time relevant to this complaint.

54. Phase I grants and contracts are awarded for research projects lasting approximately six months to one year.

55. With the exception of certain Direct to Phase II awards not relevant here, Phase II grants and contracts are awarded only to successful Phase I participants.

56. Phase II grant awards and contracts are based on Phase I "data results," which results are expressly reported in detail in Phase II proposal. That is, Phase II grants and contracts are awarded only where the recipient has demonstrated that its new technology is potentially feasible.

57. Phase II grants are awarded not only for the cost of continuing research on scientific and technical issues but are also for determining the potential commercial applications of new technology and products (i.e., "commercialization").

58. Phase II grant awards and contracts are typically for an extended research term of approximately one to two years. In some circumstances they can be extended for one Sequential Phase II Award.

69. Currently, Phase II grants and contracts are awarded in amounts up to $2,045,816 per grant or contract, although the amount was substantially lower during the time relevant to this complaint.

60. Phase III involves private sector or non-SBIR Government agency funding to the small business to patent, market, license, manufacture, or in other ways, commercialize its Phase II project.

### SBIR Grant Evaluation and Award Process

61. In order to obtain an SBIR grant, applicants respond to agency solicitations with business proposals.

//

//

12

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

62. The proposals outline, among other things, the research that will be conducted, the key personnel who will conduct the research and the facilities and equipment that will be used to conduct the research.

63. The proposals also contain a section with a proposed research budget that outlines the proposed expenses, including, among other things, personnel, labor cost, overhead, materials and equipment. All Proposals are submitted with a Standard Form SF424 Application for Federal Assistance ("SF424") or its equivalent. SF424 requires the person filing the submission to certify the following (or its equivalent): "By signing this application, I certify (1) to the statements contained in the list of certifications and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 218, Section 1001)."

64. As a threshold matter, to receive an SBIR grant, the applicant must qualify as a "small business concern," defined by the SBA regulations. See 13 CFR §§ 701-705; see also 13 C.F.R. Part 121 (that is, a U.S.-based business, owned by a U.S. citizen or permanent resident alien, with no more than 500 employees, including affiliates).

65. Likewise, the applicant must confirm that the small business will employ the prospective PI, and that the company itself, through its employees, will perform two-thirds (2/3) of the Phase I work and at least one-half (1/2) of the Phase II work. See Defense SBIR/STTR - SBIR / STTR Interactive Participation Guide (defensesbirsttr.mil).

66. SBIR grants and contracts are competitively awarded based on not only scientific and technical merit and feasibility, but also on potential commercialization.

67. Panels of scientists, engineers and agency personnel review and evaluate SBIR grant applications on behalf of the awarding agencies.

68. In evaluating the proposals for SBIR awards, the panel of reviewers rely on the truth and accuracy of the information contained in the proposals (i.e., the Phase I and Phase II grant proposals") as a basis for awarding the grants.

13

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

69. Among other things, in recommending the awarding of SBIR grants the evaluators consider the relevant qualifications of the PI and key personnel, including, but not limited to their formal academic credentials and employment history, the soundness and technical merit of the proposed approach, the potential commercial applications of the project, the likelihood that the proposed research will fulfill the requirements of the topic or problem the awarding agency sought to be addressed and the proposed budget. This is based on each funding agency's criteria.

70. Each awarding agency promulgates its own set of SBIR regulations and instructions and distributes its own forms.

71. Most, if not all, of the awarding agencies' rules and documents are available on the agencies' web sites. This is based on each funding agency's criteria for technical merit and soundness.

72. Once a proposal is selected and the Government agency awards an SBIR "contract," the proposal submitted by the applicant, which includes a budget proposal, typically becomes incorporated into the contract and is used as the statement of work.

73. Some awarding agencies, such as the National Science Foundation ("NSF"), refer to the awards as "grants," whereas other agencies, such as NASA and DOD, refer to the awards as "contracts." The terms are used interchangeably in this complaint.

### Timesheets and Costs Reporting

74. The budget summary in the proposals contains an allocation of requested funds to enable the government agency to determine whether the proposed budget is fair and reasonable.

75. The budget summary contains detailed information for each cost element, including, (a) direct labor to the PI and engineers or technical staff, (b) labor rates and hours proposed, (c) direct costs, such as materials, supplies, and lab fees, (d) overhead, (e) general and administrative costs, and (f) fees or profit for the company.

76. The small business is only entitled to research costs actually incurred.

//

14

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

77. The SBIR.gov website provides tutorials on accounting practices for grant award recipients.

78. The proposal forms the basis for the amount awarded under the contract, up to the maximum amounts for the Phase I and Phase II grants and contracts.

79. The funding agency relies on the small business to provide accurate costs in the cost budgets in order to set the amount of the grant or contract.

80. In submitting the proposal, the small business is typically required to certify that all information in the proposal is true and accurate.

81. According to SBA's website, "[t]he expectations regarding the sophistication of a small business accounting system changes between Phase 1 and Phase II." That is because a Phase I award involves less money and is usually a firm fixed price award, meaning the recipient is required to perform the work necessary in exchange for the grant amount. SBIR.gov/tutorials/accounting-finance/tutorials2#; see also 48 C.F.R. § 16.202 (discussing firm fixed price contracts).

82. Phase II grant awards on the other hand usually require SBIR grant recipients to move to a cost plus fixed fee ("CPFF") accounting system which allows them to track the cost of each grant and distinguish those costs from one project to another, as well as to distinguish direct and indirect costs. See 48 C.F.R. § 16.306 (discussing cost plus fixed fee contracts).

83. Because the Government will generally only pay award recipients in Phase II based on the documented costs of doing the Phase II work, such documents must accurately reflect those costs, of which labor is the most common cost. SBIR.gov/tutorials/accounting-finance/tutorials2#.

84. In order for SBIR grant recipients in Phase II to accurately reflect their labor costs, each employee of the small business must keep an accurate timesheet, regardless of whether they perform work that is billable to a specific grant project or not. *See* Defense Contract Audit Agency (DCAA) Manual No. 7641.90 *Information for Contractors*, Enclosure 2, Section 4 at p. 16 (requiring companies to keep detailed instructions for

15

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

timesheet preparation through a timekeeping manual and/or company procedure indicating that the employee is responsible for "the correct distribution of time by project numbers, contract number or name, or other identifiers for a particular assignment" and for "recording all hours worked whether they are paid or not").

85. Employee timesheets must "list separately each contract, grant and other directly billed projects of the company on which the employee is working," and must be reviewed by a company supervisor. SBIR.gov/tutorials/accounting-finance/tutorials2#; *see also* DCAA Manual No. 7641.90, Enclosure 2, Section 4 at p. 16 (stating that "the supervisor should approve and cosign all timesheets" and that the "guidance should state that the nature of work determines the proper distribution of time, not availability of funding, type of contract, or other factors."); *see also* SF 1408 Preaward Survey of Prospective Contractor Accounting System (including "identification and accumulation of direct costs by contract" as one of the requirements by which DCAA evaluates a company's accounting system).

86. Not only are SBIR participants required to set up an approved accounting system, but they must also certify to having an accounting system in place that meets the requirements of Phase II in order to participate in Phase II funding. This self-certification is done by completing and executing a Standard Form SF 1408 (Preaward Survey of Prospective Contractor (Accounting System) ("SF 1408").

87. The SF 1408 is a document used by the Government to determine a potential contractor's ability to meet a contract's accounting and financial management requirements. Incorrectly completing the SF 1408 can result in an SBIR Phase II proposal being rejected and other potential penalties.

88. Among other things, an SBIR Phase II participant must certify on the SF 1408 that they have "A timekeeping system that identifies employees' labor by intermediate or final cost objectives" and "A labor distribution system that charges direct and indirect labor to the appropriate cost objectives." See SF 1408 Section II – Evaluation Checklist, items e and f.

16
**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

89. Having a labor cost/employee timekeeping system where management distributes pre-populated timesheets is not an acceptable accounting system. This is particularly true where the persons pre-populating the timecards are involved in tracking SBIR contract budgets.

90. Defense Contract Audit Agency ("DCAA") and Defense Logistics Agency ("DLA") onsite time systems audits play a critical role in ensuring proper SBIR contract billing for labor costs and preventing fraud. They also ensure that the designated PI performs the research called for under the grant or contract and that the SBIR contractor uses its employees to perform two thirds of the Phase I work and one-half of the Phase II work, as required by SBIR time and effort regulations, which regulations are conditions of payment.

### Requests for Payments and Progress Reports

91. Regardless of the form used to request payments from the various funding agencies, the small business' request is always accompanied by, and payment is always conditioned on, "progress reports" purporting to show that certain research effort milestones have been met. Such reports are appended to as Standard Form 298 (form for submitting scientific and technical reports to contracting officers) ("SF 298").

92. For example, to receive payment for work done on an SBIR project, NASA contracts require the small business to request progress payments from NASA using a Standard Form 1443 ("SF 1443"), also known as a Contractor's Request for Progress Payments, which is accompanied by invoice(s).

93. Similarly, to receive payments on DOD SBIR contracts, the small business must submit a material Inspection and Receiving Report Form 250, also known as a DD250, accompanied by invoice(s).

### BAAS AND THE FEDERAL ACQUISITION REGULATION

94. A BAA is a tool for acquisitions pursuant to the Federal Acquisition Regulation ("FAR"), codified at Parts 1 through 58 of Title 48 of the Code of Federal Regulations.

//

17

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

95. As defined in the FAR, a BAA "means a general announcement of an agency's research interest including criteria for selecting proposals and soliciting the participation of all offerors capable of satisfying the Government's needs." (FAR 2.101.)

96. FAR 6.102(d)(2) further clarifies the use of a BAA for "[c]ompetitive selection of basic and applied research and that part of development not related to the development of a specific system."

97. An agency's use of a BAA in connection with research grants is governed, in part, by the requirements of FAR 35.016 and the other applicable FARs.

98. Individual agencies can also impose requirements with respect to BAAs and contracts awarded pursuant to them.

99. The NIH, for example, has issued a Policy Manual with respect to BAAs setting out procedures in addition to those set out in the FAR ("NIH BAA Manual"). The NIH BAA Manual provides, for example, that "proposals received in response to a BAA shall be evaluated by the peer review process as established at 42 U.S.C. § 289a, 42 CFR Part 52h, NIH Manual Chapters 6315-1 and 7410 and in accordance with the established technical evaluation criteria in the BAA."

## SBIR MILLS

100. The creation of the SBIR Program, and specifically, its mandate for funding agencies to disperse a fixed percentage of their extramural R&D budgets to small businesses, has spawned the development of a cottage industry sometimes referred to as "SBIR Mills." See, e.g., https://benvanroo.substack.com/p/are-a-few-dozen-sbir-mills-sucking.

101. SBIR Mills tend to operate in a similar fashion. They file a large number of proposals quarterly from which they receive a small percentage of awards. They purport to diligently perform the work required during Phase I and use their putative results to get the more lucrative Phase II awards. Once they have the Phase II award in hand, their diligence drops off dramatically. They do not put a lot of time and effort into the project because there is no contract deliverable to the funding agency and it is easier to simply pocket the

18
**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

money. This incentivizes SBIR Mills to fabricate and falsify research activities and results in the proposals and progress reports they file with the funding agencies.

102. As for commercialization, SBIR Mills seldom develop useful technology that gets commercialized on any meaningful scale, if at all. Most awards are merely for "dead end" projects. See The Air Force, Impact to the Economy via SBIR-STTR: 2014 Economic Impact Study ("the more SBIR funding they [SBIR Mills] received, the less successful they were at converting that funding into new products and services that achieved commercial sales and/or supported the U.S. defense mission.") See also https://scholar.harvard.edu/files/showell/files/howell_appendix_f_sbir_mills_sept16.pdf. ("mills are less likely to commercialize their projects,… multiple awards are not associated with increased performance for SBIR awardees").

103. Thus, the SBIR Mill's business model is to simply feed from the Government's trough of mandated SBIR grant awards. This leads to the SBIR Mill's dependence on SBIR awards for revenue and the very survival of the enterprise.

104. Another typical tell-tale sign of an SBIR Mill is an unusually high turnover of its scientist employees. This often occurs because the scientists become disenchanted with doing what amounts to unfulfilling fake research on dead end projects.

**GENERAL FACTUAL ALLEGATIONS CONCERNING DEFENDANTS**

105. CHROMOLOGIC holds itself out as a company focused on innovative R&D research that leads to the commercialization of medical and technical breakthrough solutions that save lives and make the world secure.

106. In fact, CHROMOLOGIC operates as an SBIR Mill. With its history of receiving at least 56 SBIR Phase I awards (totaling $9,875,234) and 26 Phase II awards (totaling $26,659,176),, its dependence on a steady stream of SBIR grant revenue (totaling $36,534,410), its fabrication of research results and activities, including time and labor costs, its failure to substantially commercialize its technology, and its high turnover of technical personnel, including scientists and engineers, CHROMOLOGIC perfectly fits the description of an SBIR Mill.

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

107. As an SBIR Mill, CHROMOLOGIC's proposals responding to funding agency solicitations are its lifeblood, and employees who stand in the way of the submission of proposals and subsequent awards are threatened with termination and even terminated.

108. In sum, to accomplish his fraudulent objectives, MENON created an atmosphere of fear, based on threats and bullying toward CHROMOLOGIC personnel who questioned his tactics or refused to comply with his unethical business practices, many of whom could not push back because of their precarious immigration and employment status.

## Research Fraud

109. As an SBIR Mill, CHROMOLOGIC engaged in fraudulent practices with respect to the SBIR program and the BAAs by securing Phase I and Phase II SBIR and BAA grants through materially false and misleading statements and omissions in submissions and statements to various federal agencies.

110. MENON orchestrated the fraudulent submissions, directly and through subordinates, including, Rogers, Axtelle and Nguyen, by, among other things, (i) creating or directing others to falsify test data; (ii) copying or directing others to copy from other sources test data and to falsely represent that CHROMOLOGIC had achieved the test results; (iii) falsely representing the commercial viability of products; (iv) falsely representing CHROMOLOGIC's intention to perform research steps; and (v) making false statements to funding agency officials.

111. In furtherance of these fraudulent practices, among other acts, MENON and his agents, including, Rogers and Axtelle directed CHROMOLOGIC scientists (including RELATOR JOHNSON) to misrepresent, falsify and omit data and to make materially false statements and omissions, all to deceive the government agencies from which CHROMOLOGIC was seeking funds.

112. In a similar vein, MENON and his agents Rogers and Axtelle directed CHROMOLOGIC scientists (including RELATOR JOHNSON) to falsify the

20
**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

commercialization prospects of the programs for which the company was seeking SBIR funding.

### Timesheet Fraud

113. There were two distinct phases in which CHROMOLOGIC committed Timesheet Fraud. The first ended in or about November/December 2016. The second picked up from there.

114. During the first phase, administrative aide Tiffany Moreno provided employees with hard copies of a Labor Allocation report with "pre-populated" time allocated to certain SBIR projects. Moreno also provided these employees with blank "Timecards" that the employees were to fill out manually by copying the data set out in the Labor Allocation report. The employees then returned the completed and signed Timecards to their managers for approval and use by CHROMOLOGIC.

115. In the second phase, CHROMOLOGIC switched to an electronic timekeeping system using a software called Aestiva, which was installed around November 2016. In this phase, employees would typically receive electronic notices from Susan Dixon, and later Inna Pavlova, to get their Timesheets completed and uploaded. Thereafter, the employees would log onto Aestiva and get to their Timesheets, which were pre-populated with their two-week total hours allocated to specific projects. This was in a field in the lower right-hand corner of the Timesheet captioned "Budget Summary." The employees would then randomly allocate the total budget amounts they were given to specific days in the two-week period and electronically sign and upload the Timesheets for their managers' review and approval.

116. The electronic timesheets used during the second phase of the Timesheet Fraud scheme were distributed to employees on open company software, and each employee was assigned a password by the company to access their timesheets. Former IT manager Mark Medina was the person largely responsible for setting up and managing the timekeeping software and system that CHROMOLOGIC used to assign false times to various SBIR projects.

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

117. Each timesheet contained a pre-allocated budget summary on the bottom right corner listing the specific SBIR grant projects the employees were supposed to allocate time toward for the past two weeks and stating the total amount of time that employees were supposed to list for that project.

118. The amount of time for all projects listed in the pre-allocated budget summary always totaled 80 hours. Employees were required to record time to specific SBIR grant projects regardless of whether they worked on those projects or not and were required to account for 40 hours of time per week regardless of whether they worked that many hours on a specific SBIR grant project or not, thus resulting in the falsification of employee timesheets.

119. In the fall of 2016, CHROMOLOGIC held a company-wide training in which employees were instructed to spread out the required 80 hours into their time sheets according to the directed time allocations by their supervisors, as opposed to their actual time allocations on various projects. In other words, employees were instructed to fill out time sheets to reflect what their supervisors told them, and not what they actually did.

120. This training was led and/or attended by Axtelle, Nguyen, RELATOR JOHNSON and RELATOR YAE.

121. Sometimes supervisors would explain the need for specific false entries by stating, for example, that a grant award might be near expiration and CHROMOLOGIC wanted to use all of the time allocated to that grant before it expired, regardless of whether the employee actually worked on that grant project or not, or actually worked the number of hours attributed to that grant project or not.

122. Employees were also instructed to not accurately record time they spent on indirect costs, but rather to bill that time to a particular grant project, as if it were a direct cost attributable to a specific grant project.

123. The foregoing was done under the direction of MENON and his agents, including Axtelle and Ngyuen. They collectively caused CHROMOLOGIC supervisors to
//

22
**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

demand that each of their employees submit a signed completed timesheet by noon on every other Friday. Often the timesheets contained falsely allocated time.

124. MENON and his agents, including Axtelle and Ngyuen, also caused employees to make misrepresentations about their time, or evade questioning about time, during onsite time system audits by DCAA and DLA.

125. For example, it was common knowledge that during such audits there were times when Morena or Dixon would quietly approach employees who were targeted for interviews with government auditors and tell them something like, "Take a walk." In response, the employees would leave the building through a second door or find some way to hide in the lab to evade the auditor's inquiries. JOHNSON observed this happen to a female marketing employee, who responded by asking, "Are you serious?" before following instructions by making herself scarce.

126. MENON and CHROMOLOGIC, through Axtelle and his supervisees, including accountants Susan Dixon and Inna Pavlova, presented those falsified employee timesheets to SBIR funding agencies for payment and were paid. At times, Susan Dixon and/or Inna Pavlova would tell Relator Johnson that payment was made.

## CHROMOLOGIC'S PROCESS OF APPLYING FOR
## AND RECEIVING SBIR FUNDS

127. During every quarter of every calendar year, with the emphasis on the first quarter, the SBIR funding agencies released solicitations for SBIR contracts. This was done online through the separate funding agencies website portals.

128. Axtelle would scour the agency solicitations, identify Phase I solicitations of potential interest to CHROMOLOGIC and assign them to the prospective PIs he believed should handle the proposal process for each solicitation. There were times when Axtelle assigned projects to employees that they would never support (for example if the project was for the Industrial Solutions Group and the scientist was in the Biomedical Solutions Group). This is particularly significant with respect to the Timesheet Fraud scheme alleged in this complaint.

23
**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

129. Every scientist at CHROMOLOIGIC was expected by MENON to submit multiple SBIR proposals and win numerous funding agency awards. If the scientists had high SBIR award success rates, they received bonuses that could amount to 10% or more of their compensation. If they had low success rates, they were threatened with termination.

130. After being assigned solicitations, the PIs would then chair "proposal meetings" where the attendees discussed the justification for submitting the Phase I proposal and the preliminary data CHROMOLOGIC would rely on in its proposal to win approval. MENON and Rogers attended and ran every Phase I proposal meeting.

131. Where MENON decided to submit a Phase I proposal it was placed on CHROMOLOGIC's "calendar system" and the assigned PI was ordered to shepherd the proposal through the drafting and submission processes.

132. Frequently, after the Phase I proposal meeting and before the proposal's submission, at MENON's direction, the PIs contacted monitors and/or reviewers at the funding agency by telephone to find out what they were looking for in a successful submission. CHROMOLOGIC's proposals were then tailored accordingly.

133. The PIs prepared a "draft proposal" for the Phase I projects. This was done by following a template MENON had created.

134. The draft Phase I proposals were then sent to another scientist at CHROMOLOGIC for "review and comments."

135. After the internal peer review, the draft Phase I proposals were passed on first to Rogers and then to MENON, both of whom reviewed the proposals at least twice before they were submitted to the funding agencies.

136. MENON invariably made edits and/or suggested changes to every Phase I proposal, including sections concerning how experiments would be conducted and what evidence supported claims for developing a feasible product.

137. If a PI or internal reviewer voiced any doubts or concerns about the viability and feasibility of the proposed Phase I project they faced hostile reactions from MENON and Rogers, including threats of termination.

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

138. MENON signed off on every Phase I proposal and they were then uploaded by Axtelle to the funding agencies website portals.

139. The funding agencies monitors and peer reviewers would, in turn, evaluate CHROMOLOGIC's Phase I proposals.

140. If their criteria were satisfied, the funding agencies awarded the Phase I projects to CHROMOLOGIC via a funding agreement in the form of either a grant, contract or cooperative agreement. Each funding agency handled contracts and awards in different manners consistent with their policies and procedures.

141. After the Phase I projects were awarded to CHROMOLOGIC, the responsible PIs would chair "kickoff meetings" at which research objectives and tasks were discussed and assigned. MENON presided over every kickoff meeting, which were also attended by Rogers and Axtelle.

142. After the initial Phase I kickoff meeting, the PIs would chair "weekly project meetings" to review progress on the research project. MENON attended most weekly meetings and if not weekly he attended all of them on at least a bi-weekly basis. Rogers and Axtelle also attended all weekly progress meetings.

143. During the life of the Phase I project, the respective PIs would prepare draft periodic progress reports, which were conditions of payment from the funding agencies. The draft progress report would be first submitted to Rogers for his review and edits (all of which were contemporaneously shared with MENON via emails) and then given to MENON to finalize it, typically about two weeks before the progress report was due. For example, CHROMOLOGIC circulated a Bio Phase I work plan for CereTrec that instructed JOHNSON, Katherine Fisher and Wangzhong Sheng to get quarterly progress reports to Claude Rogers early enough that MENON would have "ample time to review" them.

144. During their reviews of the Phase I progress reports, MENON and Rogers would focus on "data representations and conclusions," in other words, what the research efforts had yielded. If a PI submitted a draft Phase I progress report to MENON or Rogers

25

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

with "poor data," meaning research results that reflected negatively on the project's objectives, the scientist would be berated. At times, Rogers or Menon would falsify the data themselves. For the remaining, they directed the writer of the progress reports to falsify and omit data that was considered poor.

145. The Phase I progress reports were appended to forms SF 298 and invoices and uploaded by Axtelle or his assistants (including accountants Susan Dixon and Inna Pavlova) to the funding agencies websites. The SF 298s were typically prepared by CHROMOLOGIC employees and submitted to Government contracting officers on a monthly and quarterly basis and then there was a final submission at the end.

146. It was not uncommon for the funding agencies' representatives (that is, monitors and/or science officers) to have follow up telephone calls with CHROMOLOGIC employees after the submission of Phase I periodic progress reports. However, MENON maintained an iron-clad prohibition against any PI or other scientist participating in such communications without himself, Rogers and/or Axtelle also being on the call. MENON fired at least one employee for violating this gag order. Additionally, MENON identified himself (together with his email address) as the "Business Contact" on all of CHROMOLOGIC's SBIR proposals.

147. If and when PIs or internal reviewers raised questions about the viability of a Phase I during or after the initial kickoff meetings, MENON would insist that no negative information be conveyed to monitors or reviewers at the funding agencies until he deemed it a convenient time, which usually meant when the project's funding was depleted or about to be depleted.

148. CHROMOLOGIC generally followed similar procedures for Phase II projects (that is, kick off meetings, system calendaring, weekly project meetings, periodic progress reports and invoices, follow up telephone calls with funding agency representatives, etc.). MENON was similarly involved in the Phase II activities. For example, on March 5, 2018, MENON sent an email to JOHNSON, Claude Rogers and Wangzhong Sheng concerning //

26

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

the Monthly 29 progress report for Theraspec and told them "see comments. I do not need to review this again unless you have concerns with my comments."

149. There was, however, one significant difference with the Phase II proposals. There, MENON focused with even greater attention on the proposal sections for "data workup," (that is, incorporating the purported results and significance of the Phase I research) and the potential commercialization of the prospective science and technology.

150. In sum, MENON was involved in all aspects of preparing and submitting every SBIR Phase I and Phase II proposal, progress report and invoice, if not personally, then through his trusted top aides Rogers and Axtelle.

151. CHROMOLOGIC followed the foregoing standard operating procedures for the seven specific SBIR grants and contracts discussed in particular detail below.

<strong><u>SPECIFIC INSTANCES OF RESEARCH FRAUD</u></strong>

152. DEFENDANTS engaged in Research Fraud practices and misconduct concerning numerous SBIR and BAA grants and contracts. The following are seven, non-exhaustive examples of such Research Fraud on SBIR contracts on which CHROMOLGIC applied for, received and retained Government funds.

153. None of these SBIR contracts was ever commercialized.

<strong>A. <u>CereTRec</u></strong>

154. CHROMOLOGIC engaged in Research Fraud in connection with an SBIR Phase I award for a program called CereTRec. Below are the specific details of this fraud. CereTRec was intended to develop a drug that could be used to treat traumatic brain injury ("TBI").

    a. Contract Title: Cerebral Trauma Recovery (CereTRec) drug delivery system

    b. Contract Number: W81XWH-17-C-0221 (also shown as W81XWH17C0221)

    c. Total Award Amount: $149,824

    d. Awarding Agency: DOD/DHA (Defense Health Agency)

27<br><strong>FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</strong>

e. Solicitation Number: 2017.1

f. Solicitation Year: 2017

g. Award Year: 2017

h. Award Start Date: September 25, 2017

i. Award End Date: April 24, 2018

j. PI: RELATOR JOHNSON

k. Business Contact: DEFENDANT MENON

l. Abstract In order to meet the Defense Health Agency's need for addressing the prevention of secondary brain injury from moderate, severe and penetrating traumatic brain injury (TBI), CHROMOLOGIC proposes to develop a cerebral trauma recovery (CereTRec) drug delivery system. In particular, CereTRec aims to treat TBI during prolonged field care (PFC) to stabilize casualties who sustain a moderate-severe TBI. In Phase I, CHROMOLOGIC will develop, formulate, and test CereTRec for in vitro pre-clinical studies. In Phase II, CereTRec will be refined to be tested in large animal or non-human primate pre-clinical models of moderate-severe TBI for efficacy and drug dose.

m. Specific fraudulent misrepresentation(s)/misconduct: During the course of the Phase I SBIR, MENON was less interested in the data, but more interested in how he could maximize his profit from the program. MENON directed JOHNSON to compromise experiments and data for the sake of financial gain, even ordering JOHNSON to produce a fabricated/exaggerated "dose-response curve" (i.e., track concentration and release over time) on neuronal primary cells that had never been made for the Phase I progress reports. JOHNSON produced this data and subsequently CHROMOLOGIC used it for the Phase II proposal. Menon ordered Johnson to fabricate data to show that CereTRec was safe at the reported dose, despite the drug not having been tested properly.

155. CHROMOLOGIC engaged in Research Fraud in connection with an SBIR Phase II award for CereTRec. Below are the specific details of this fraud.

//

28

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

a. Contract Title: Point of Injury Therapy to Maintain and Stabilize Moderate-Severe Traumatic Brain Injury (TBI) Casualties.

b. Contract Number: W81XWH-18-C-0358 (also shown as W81XWH18C0358)

c. Total Award Amount: $999,986

d. Awarding Agency: DOD/DHA

e. Solicitation Number: 2017.1

f. Solicitation Year: 2017

g. Award Year: 2018

h. Award Start Date: August 27, 2018

i. Award End Date: January 26, 2021

j. PI: RELATOR JOHNSON. Other employees on project: Claude Rogers, Wangzhong Sheng and DEFENDANT MENON

k. Business Contact: DEFENDANT MENON

l. Abstract: In order to meet the Defense Health Agency's need for addressing the prevention of secondary brain injury from moderate, severe and penetrating traumatic brain injury (TBI), CHROMOLOGIC proposes to develop a cerebral trauma recovery (CereTRec) drug delivery system. In particular, CereTRec aims to treat TBI during prolonged field care (PFC) to stabilize casualties who sustain a moderate-severe TBI. In Phase II, CereTRec will be refined to be tested in large animal or non-human primate pre-clinical models of moderate-severe TBI for efficacy and drug dose.

m. Specific fraudulent misrepresentation(s)/misconduct: In the Phase II solicitation, CHROMOLOGIC falsely represented its intention to complete various animal (mice) studies to determine the best formulation for efficacy and safety studies. In fact MENON had no intention of completing the studies as CHROMOLOGIC represented it would and CHROMOLOGIC never completed such studies because MENON did not want to spend money to conduct .animal studies and decided to forgo them. When JOHNSON tried to have the animal studies done, MENON threatened to kick him off the program. Accordingly, all representations in the Phase II solicitation and subsequent progress

29

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

reports that referred or related to animal studies were false and entirely fabricated. For example, CHROMOLOGIC, through Claude Rogers as PI submitted a progress report with fabricated data for a study that was never actually conducted.

## B. **miDOS/MiRAD**

156. miDOS involved the creation of a micro RNA-based tissue-specific radiation biodosimiter. Its function was to "measure the concentration of circulating microRNA (miRNA) . . . and provide tissue specific radiation biodosimitry." That is, miDOS was intended to develop a prototype of a medical device that could identify lethal or problematic levels of radiation in people who were exposed through nuclear accidents or attacks by testing certain biomarkers (here micro RNAs that are altered due to exposure to radiation) in their bodies.

157. MiRAD's objective was essentially the same as miDOS', namely, to "measure changes in microRNA biomarkers in a patient's blood for diagnosis of" acute radiation syndrome. While miDOS was to report as to the existence of biomarkers, MiRAD was to measure the concentrations of the biomarkers. In other words, miDOS and MiRAD were both projects to address the tracking of miRNAs in a person to determine partial radiation dose.

158. Both proposals submitted by Chromologic claim to develop an instrument that would be point-of-care ("POC") in nature and act to identify those exposed to radiation following a radiation/nuclear event. In short, the only difference between the two projects was their names.

159. HHS/NIH awarded CHROMOLOGIC a BAA award Phase I award for miDOS in the amount of $1,751,981. The award date was February 28, 2017, and the contract number was HHSN272201700012C.

160. RELATOR JOHNSON was a support scientist on miDOS.

//

//

30
**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

161. Other employees on miDOS were: Agnes Lukaszewicz, Claude Rogers, Katherine Fisher, Michelle Nguyen, Mark Starbird, RELATOR JOHNSON and DEFENDANT MENON.

162. The miDOS Phase II contract number was 2R44AI108019-04.

163. The MiRAD Phase I contract data is as follows.

    a. Contract Title: MicroRNA-Based Radiation Biodosimeter (MiRAD)

    b. Contract Number: 1R43AI108019-01A1 and Project Number: 1R43AI108019-01A1

    c. Total Award Amount: $ 585,555

    d. Awarding Agency: HHS/NIH (National Institute of Allergy and Infectious Diseases or "NIAID".)

    e. Solicitation Number: PA12-044

    f. Solicitation Year: 2014

    g. Award Year: 2014

    h. Award Start Date: June 1, 2014

    i. Award End Date: May 31, 2017

    j. PI: Claude J. Rogers

    k. Business Contact: DEFENDANT MENON

    l. Abstract: The broad long term goal of this project is to develop an optically based radiation biodosimeter that rapidly measures changes in serological microRNA miRNA biomarkers to predict acute radiation syndrome (ARS). MicroRNAs (miRNAs) are short base noncoding RNA strands that control a host of biological processes through regulation of protein expression. Exposure to radiation has been shown to alter expression of a miRNA panel linked with ARS, thereby establishing that serum concentration of these miRNAs could be used as a predictive assay for ARS. To measure changes in these miRNA radiation biomarkers we will develop a MicroRNA based Radiation Biodosimeter MiRAD system which combines automated magnetic bead based screening for miRNA targets with Amplified Reflectometric Interference Analysis (ARIA), a patented

31

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

CHROMOLOGIC technology for highly sensitive and specific quantification of s of miRNA radiation biomarkers in parallel. In preliminary studies we have demonstrated the novel concept of the device and its ability to accurately measure subfemtomolar concentrations of miRNA in ovarian cancer serum samples (many times less than current RNA quantification platforms such as RT PCR). Our preliminary studies using rodent plasma also have identified panel of miRNAs with dose and time dependent response to whole body irradiation (WBI) in a dose range relevant to medical triage in case of a radiological event The hypotheses we seek to validate under the proposed proof of concept study are the miRNA panel identified in a murine model through analysis of plasma can be used to measure WBI dose in a clinical setting, A similar miRNA panel can be used to measure WBI dose in nonhuman primates and humans the resulting identification of a unique and dose responsive combination of miRNA markers will result in a rapid POC blood based microchip assay for anticipating ARS within the first week of exposure thereby guiding the allocation of exposed subjects for timely medical intervention. PUBLIC HEALTH RELEVANCE A critical need exists in the area of radiation countermeasures to properly diagnose and treat victims of a nuclear or radiological incident who are at risk for developing acute radiation syndrome (ARS) CHROMOLOGIC proposes to develop the MiRAD technology which will measure changes in microRNA biomarkers in a patient's blood for diagnosis of ARS The creation of this predictive diagnostic system will result in early and improved treatment allocation, reduced mortality, and provide a means of predicting toxicities in patients undergoing radiotherapy especially in situations where over or under dosing remain a concern

164. The MiRAD Phase II contract data is as follows:

   a. Contract Title: MicroRNA-based Radiation Biodosimeter (MiRAD) Phase II

   b. Contract Number: 2R44AI108019-03 and Project Number: 5R44AI108019-04

   c. Total Award Amount: $2,999,779

   d. Awarding Agency: HHS/NIH (National Institute of Allergy and Infectious Diseases.)

   e. Solicitation Number: PA15-065 (also shown as PA-15-065)

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

f. Solicitation Year: 2015

g. Award Year: 2018

h. Award Start Date: September 5, 2018

i. Award End Date: August 31, 2021

j. PI: Claude J. Rogers. Grant Application Reviewer: RELATOR JOHNSON

k. Business Contact: DEFENDANT MENON

l. Abstract: Abstract In response to PA-15-065, the broad long-term goal of this project is to develop a portable radiation biodosimeter to be used at the point-of-care (POC) for assessing precise radiation exposure and susceptibility for acute radiation syndrome (ARS) within the first 7 days of exposure starting with ~250 µL of blood collected from a finger stick and a turnaround time (TAT) of less than 40 minutes. The device measures changes in circulating microRNA (miRNA), small RNA molecules 18–24 nucleotides long that are released into the circulatory system by cells throughout the body, as biomarkers. These molecules can provide a means to assess the systemic health of the individual via a minimally invasive blood draw of a small amount of blood. Exposure to radiation has been shown to alter expression specific miRNA sequences, thereby establishing that these biomarkers could be used as a predictive assay for ARS. To measure changes in these miRNA radiation biomarkers, we will develop a microRNA-based Radiation Biodosimeter (MiRAD) system, which combines (1) POC isolation of circulating miRNA from whole blood, (2) detection of miRNA abundance using a battery-operated, portable RT- qPCR system adapted for use at the POC, and (3) specialized data processing algorithms to estimate exposed dose based on the miRNA profile of a panel of key markers. In Phase I, we have demonstrated in non-human primate (NHP) and pilot clinical studies that circulating concentrations of specific miRNA biomarkers are sensitive to exposure to whole body ionizing radiation in a dose- and time-dependent manner. A small amount of whole blood (200–500 µL), taken in the field, is processed using a novel sample preparation kit we developed and commercialized (www.chromologic.com/mir-clear), that performs (a) chemo-mechanical isolation of plasma, and (b) extraction of circulating microRNA (miRNA) without the need for power, laboratory equipment, or a technical user. Specific miRNA radiation

33

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

biomarkers are analyzed by the MiRAD PCR assay using commercial, off-the-shelf, battery-operated PCR machines. Based on the profile of the miRNA biomarker panel, MiRAD estimates the amount of absorbed radiation by the patient. During Phase I, we developed a robust analytical method and identified a panel of miRNA biomarkers capable of accurate estimation of exposed dose and asymptomatically predict the onset of hematopoiesis and ARS using mice, non-human primate (NHP), and clinical samples. Moreover, we found that key miRNA radiation biomarkers were present in sufficient abundance, and changed in response to radiation dose (0–6.5 Gy) with sufficient magnitude (up to 25-fold), to allow isolation from about 200 μL of plasma with our proprietary POC sample processing kit and quantification by COTS qPCR. A critical need exists in the area of radiation countermeasures to properly diagnose and treat victims of a nuclear or radiological incident who are at risk for developing acute radiation syndrome (ARS). CHROMOLOGIC proposes to develop the MiRAD technology, which will measure changes in microRNA biomarkers in a patient's blood for diagnosis of ARS. The creation of this predictive diagnostic system will result in earlier and improved treatment allocation, reduced mortality, and provide a means of predicting toxicities in patients undergoing radiotherapy, especially in situations where over- or under-dosing remain a concern.

m. Specific fraudulent misrepresentation(s)/misconduct: CHROMOLOGIC, through Claude Rogers, plagiarized data from miDOS research in the MiRAD Phase II proposal. Furthermore, miDOS data was not disclosed as being used to support MiRAD Phase II proposal.

165. DEFENDANT MENON repeatedly stated in project meetings miDOS and MiRAD would be CHROMOLOGIC's "gravy train" and he would "milk it for years."

166. MENON also forced the bioinformatics scientist Katherine Fisher to falsify and misrepresent data on Phase II progress reports and in a face to face and multiple telephone conferences with Government representatives/project managers (including Marylan lnu) under threat of termination. Specifically, MENON forced Fisher to state in sum and in substance that no further testing was needed in Phase II because sufficient proof had been obtained, when, in fact, there were still key unknowns, such as there was not a

34

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

defined understanding of what the spike in data was telling us about identifying miRNAs. This was key to understanding how to determine radiation-specific indicators/biomarkers for the program. Additionally, Claude Rogers manipulated (or "filtered" in his words) Fisher's data to falsely show that conclusive/favorable results had been achieved, when they had no conclusive results and the sampling was insufficient.

167. CHROMOLOGIC never developed a device prototype for either the miDOS or MiRAD projects.

## C. **MagTaT**

168. CHROMOLOGIC engaged in fraud in connection with an SBIR grant for a program called MagTaT, short for Magnetically Targeted Therapeutics system.

169. MagTaT involved the development of drug that was intended to be "an orally administered nanoparticle formulation" for management of pain from Peripheral Neuropathy.

170. The MagTaT Phase I contract data is as follows.

    a. Contract Title: Magnetically Targeted Therapeutics System

    b. Contract Number: W81XWH16C0181

    c. Total Award Amount: $ $99,971.86

    d. Awarding Agency: DOD/Army (Medical Research

    e. Proposal Number: A161-059-0952

    f. Proposal Year: 2016

    g. Award Year: 2016

    h. Award Start Date: September 28, 2016

    i. Award End Date: March 2017

    j. PI: Louis Chin Jones. Support Scientist: RELATOR JOHNSON

    k. Business Contact: DEFENDANT MENON

35

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

l. Abstract: MagTat was a polymer-based nanoparticle system aimed at magnetically accumulating at the site of pain and releasing therapeutics to treat peripheral neuropathy.

m. Specific fraudulent misrepresentation(s)/misconduct: DEFENDANT MENON directed RELATOR JOHNSON to falsify data on toxicity. In lieu of needed additional research and testing, MENON said CHROMOLOGIC would simply utilize existing data, which Claude Rogers altered at MENON's direction – to make seem as if we redone the experiments based on the feedback from the government monitor. Such falsified data was included in the Phase II proposal and also various Phase I progress reports that CHROMOLOGIC submitted to DOD. The latter included falsified data in Figure 2-3 and the corresponding discussion in Report No. 4 for Phase I and Figure 2-3 and the corresponding discussion in Report No. 5.

171. CHROMOLOGIC applied for a Phase II MagTaT but it was denied.

172. Additional allegations concerning MagTaT fraud: RELATOR JOHNSON set up drug release studies that demonstrated the process was not consistent in the release kinetics. DEFENDANT MENON ordered Claude Rogers to step in and address how to falsely represent the data to the Government. Louis Chin Jones joined a meeting with the DOD monitor David Duke and science officer, in which Jones admitted to the false data in the Phase I program. The monitor raised concerns and brought these allegations to MENON. In response to Jones' whistleblowing on his own program, MENON promptly fired him. MENON then implemented his policy requiring that CHROMOLOGIC employees could only communicate with Government representatives if he , Jim Axtelle or Claude Rogers was present. Likewise, MENON instituted a rule that all employee's emails to Government representatives had to be reviewed by him, Axtelle or Rogers before they were sent.

### D. OPPAH

173. CHROMOLOGIC engaged in fraud in connection with an SBIR grant for a program called Ocular Penetrating/Perforating injuries Assessment Hydrogel system ("OPPAH").

36

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

174. OPPAH involved the development of a test administered by a medic at Role of Care Level One to detect the presence of penetrating ocular injury. In other words, the project was intended to develop a proto type for a medical device to test for eye injuries.

175. The Phase I contract information for OPPAH is as follows:

    a. Contract Title: Ocular Penetrating/Perforating injuries Assessment Hydrogel system (OPPAH)

    b. Contract Number: W81XWH19C0001

    c. Total Award Amount: $ 149,957

    d. Awarding Agency: DOD/DHA

    e. Solicitation Number: 18.2

    f. Solicitation Year: 2018

    g. Award Year: 2019

    h. Award Start Date: December 17, 2018

    i. Award End Date: July 16, 2019

    j. PI: Lormen Lue. Support Scientist/Grant Reviewer/Successor PI: RELATOR JOHNSON

    k. Business Contact: DEFENDANT MENON

    l. Abstract: In order to meet Defense Health Agency's need for rapid confirmation and evaluation of open globe injuries, to allow for appropriate initial triage, evacuation, and treatments, CHROMOLOGIC LLC (CL) proposes to develop an Ocular Penetrating/Perforating injury detection.

    m. Specific fraudulent misrepresentation(s)/misconduct: CHROMOLOGIC submitted Phase I progress reports which included fabricated data on concentration levels of aqueous humor that would indicate a penetrating/perforating injury, when, in fact, such concentrations could not be detected. These false concentration level results were repeated in a Phase II application for OPPAH that was denied. MENON directed Claude Rogers and JOHNSON to falsify this data.

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

176. When JOHNSON protested that certain Phase I tests would not work, specifically, that aqueous humor could not be detected, MENON replaced JOHNSON, who had become successor PI, with Espoir Kyubwa.

## E. SYNFACT

177. CHROMOLOGIC engaged in fraud with respect to an SBIR grant for a program called SYNFACT.

178. SYNFACT involved the development of synthetically formulated anatomically correct skin and organ tissues. Its objective was to develop synthetic tissues for mimicking the healing process that could be used to train medical personnel in how to suture it.

179. The contract data for Phase I for SYNFACT is as follows:

    a. Contract Title: Synthetically Formulated Anatomically Correct Tissues (SYNFACT)

    b. Contract Number: W81XWH-17-C-0197 (also shown as (W81XWH17C-0197)

    c. Total Award Amount: $149,950

    d. Awarding Agency: DOD/DHA

    e. Solicitation Number: 2017.1

    f. Solicitation Year: 2017

    g. Award Year: 2017

    h. Award Start Date: September 15, 2017

    i. Award End Date: April 14, 2018

    j. PI: RELATOR JOHNSON

    k. Business Contact: DEFENDANT MENON

    l. Abstract: In order to meet Defense Health Agency's need for anatomically correct, self-healing, synthetic tissues for surgical training, CHROMOLOGIC proposes to develop synthetically formulated anatomically correct tissues (SYNFACT). Surgical training

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

models will be selected for fabrication on the SYNFACT system GUI and fabricated on site. SYNFACT surgical training models will self-heal between uses for reuse within 24 hours. In Phase I, CHROMOLOGIC will develop, fabricate and test a suite of SYNFACT grafts and will develop a prototype fabrication tool. In Phase II, SYNFACT graft materials will be refined and multiple-tissue models and fabrication processes, and a second generation fabrication tool with a simple GUI designed, prototyped and tested.

m. Specific fraudulent misrepresentation(s)/misconduct: In the Phase I, CHROMOLOGIC falsely represented its intention to carry out the studies/experiments that would meet the specifications of contract performance and goals and submitted false progress reports with fabricated results. Specifically, CHROMOLOGIC submitted to the Government a video purporting to show self-healing tissues (hydrogel) when in fact the separated hydrogel was Superglued together. They made up results to satisfy the requirements of the Phase I.

180. The Phase II contract data for SYFACT is as follows:

a. Contract Title: Self-Healing Elastomer for Medical Simulation & Training

b. Contract Number: W81XWH-18-C-0094 (also shown as W81XWH18C0094)

c. Total Award Amount: $ 999,912

d. Awarding Agency: DOD/DHA

e. Solicitation Number: 2017.1

f. Solicitation Year: 2017

g. Award Year: 2018

h. Award Start Date: September 24, 2018

i. Award End Date: February 23, 2021

j. PI: RELATOR JOHNSON

k. Business Contact: DEFENDANT MENON

39

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

l. Abstract: In order to meet Defense Health Agency's need for anatomically correct, self-healing, synthetic tissues for surgical training, CHROMOLOGIC proposes to develop synthetically formulated anatomically correct tissues (SYNFACT).

m. Specific fraudulent misrepresentation(s)/misconduct: Phase I false results were incorporated into the Phase II Proposal. Additionally, CHROMOLOGIC made false statements in progress reports for the Phase II work. For example, CHROMOLOGIC misrepresented in Section 4.0 of its Phase II Report No. 5 its intention to complete the work set out therein; CHROMOLOGIC had no intention of completing that work and, in fact, never completed it.

181. Additional fraud allegations: During the Phase I program, DEFENDANT MENON was upset about having to spend money to carry out experiments and produce material. He therefore directed RELATOR JONHSON and others to generate a "tissue" that ultimately did not simulate the healing process in the end. MENON knew of this failure but pressured JOHNSON and others to generate photos and video of the false self-healing tissue for the progress reports. During Phase I, JOHNSON tried to alert Hugh Connacher, the DOD monitor, during a telephone call about the project's deficiencies. But MENON precluded this by telling JOHNSON "shut up" during the call. When CHROMOLOGIC was supposed to produce a tissue sample for DOD at the end of the Phase I program, JOHNSON and others were forced by MENON to purposely package the tissue to disintegrate in transport to the Government so the monitor would not know the truth about CHROMOLOGIC's lack of progress. During Phase II, JOHNSON tried to get MENON to send proper tissue samples to the DOD but MENON refused, saying, "do not bother sending them anything unless they ask for it." MENON also made JOHNSON and others generate falsified reports on the progress of the Phase II program. Everything was false about Phase II. No self-healing tissue was created and no experiments were done to even attempt to actually do so. It got so bad, JOHNSON quit his job and took another job as a contractor at a pharmaceutical company (Celgene) three hours away from his home.
//

40
**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

## F. <u>THERASPEC</u>

182. CHROMOLOGIC engaged in fraud with respect to an SBIR grant for a program called THERASPEC.

183. THERASPEC involved a spectroscopic system for therapeutic drug monitoring. The intended product was "a point- of-care ("POC")" in vitro diagnostic device that quantifies antibiotics and antifungals circulating in blood plasma using Raman Spectroscopy." In other words, the objective was to develop a proto type for a blood testing medical device.

184. The contract data for the THERASPEC Phase I award is as follows:

    a.  Contract Title: Spectroscopic system for therapeutic drug monitoring

    b.  Contract Number: W81XWH-15-C-0127

    c.  Total Award Amount: $999,988.00

    d.  Awarding Agency: Department of Defense

    e.  Solicitation Number: A13-082 2013.2

    f.  Solicitation Year: 2013

    g.  Award Year: 2015

    h.  Award Start Date: 9/25/2015

    i.  Award End Date: 2/27/2018

    j.  PI:

    k.  Business Contact: DEFENDANT MENON

    l.  Abstract:

    m.  Specific fraudulent misrepresentation(s)/misconduct: All the data presented in Phase I was false and could not be replicated in Phase II.

185. The contract data for Phase II of THERASPEC is as follows:

    a.  Contract Title: Spectroscopic System for Therapeutic Drug Monitoring (THERASPEC)

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

b. Contract Number: W81XWH-15-C-0127

c. Total Award Amount: $ 999,988

d. Awarding Agency: DOD/DHA

e. Solicitation Number: 2013.2

f. Solicitation Year: 2013

g. Award Year: 2015

h. Award Start Date: September 25, 2015

i. Award End Date: February 27, 2018

j. PI: Anu Biswas

k. Business Contact: DEFENDANT MENON

l. Abstract: CHROMOLOGIC LLC (CL) is developing a Spectroscopic System for Therapeutic Drug Monitoring (THERASPEC), to meet the Army's need for a compact, robust system to assess the peak and trough therapeutic drug concentrations in blood to provide real-time TDM in fixed and field medical facilities. The THERASPEC prototype is based on a spectroscopic system for therapeutic drug monitoring.

m. Specific fraudulent misrepresentation(s)/misconduct: The Phase I reports concluded that the THERASPEC device was able to detect therapeutically relevant concentrations of vancomycin and other very important antifungals and antimicrobials. This representation was false. The data supporting it was plagiarized from other tests that did not use the THERASPEC device. In addition, in the Phase II reports, CHROMOLOGIC submitted falsified data relating to therapeutic drug concentrations. The drug of interest was spiked into the sample after the sample was filtered and then measured. In some cases, the drug of interest was spiked into buffer and tested but reported as being tested in samples derived from whole blood samples. CHROMOLOGIC employees, at MENON's direction, performed tests on whole blood samples after they had passed the blood through a sieve and eliminated the vast majority of proteins, which then allowed Chromologic to falsely claim that therapeutically relevant concentrations of vancomycin were detectable.

42

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

186. Additional fraud allegations: RELATOR JOHNSON and others told MENON they did not want to present falsified data in the THERASPEC Phase II solicitation. MENON overrode these objections and ordered the submission of the falsified data. CHROMOLOGIC employees were never able to replicate the data reported in the Phase I program. During the Phase II solicitation, MENON and Rogers told JOHNSON and others, including Louis Chin Jones and Wangzhong Sheng, during weekly THERASPEC project meetings to continue restating the false Phase I data in Phase II progress reports. JOHNSON and others followed this directive.

187. The key to the THERASPEC fraud was in defining when the antifungal/microbial was spiked into the whole blood/plasma. Spike ins would be identical to "real world" conditions if the drug was spiked into the whole blood. However, the spike ins were never spiked into the whole blood. Rather, the spike ins were introduced into the filtered and "processed" plasma sample – some three steps in processing from the claimed point at which the drug was usually spiked into the sample.

188. For all THERASPEC Phase II reports, MENON and Rogers were aware of the "spike in" fraud on this program and chose to continue it.

189. CHROMOLOGIC's Phase II progress reports also falsely claimed that THERASPEC was contained in a small ruggedized bedside module (approximately one foot by one foot in size). In fact, it was the contained in a 10 foot by 10 foot lab space.

190. CHROMOLOGIC employees Louis Chin Jones and Wangzhong Sheng (to name only a few) tried to redress the false representations in the THERASPEC Phase II progress reports. When they did MENON and Rogers threatened to terminate their jobs.

191. CHROMOLOGIC never developed a prototype medical device for THERASPEC.

## G. **BAID**

192. CHROMOLOGIC engaged in fraud with respect to an SBIR grant for a program called BAID.

//

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

193. BAID involved the development of a biometric identification and access management system. The intended users were medical personnel and patients in situations with intermittent network access.

194. More specifically, the objective of the BAID Phase I program was to develop an interface for soldiers to diagnose themselves through a digital process – on either a computer or phone – so that no physical interaction between the soldier and medical personnel would be required.

195. The Phase I contract data for BAID is a follows:

    a. Contract Title: Biometric Authentication and Identification (BAID)

    b. Contract Number: W81XWH-18-C-0011

    c. Total Award Amount: $149,917

    d. Awarding Agency: DOD/Army

    e. Solicitation Number: 17.1

    f. Solicitation Year: 2017

    g. Award Year: 2017

    h. Award Start Date: June 22, 2017

    i. Award End Date: May 6, 2019

    j. PI: Virginio Sannibale. Grant Reviewer: RELATOR JOHNSON

    k. Business Contact: DEFENDANT MENON

    l. Abstract: In order to meet the US Army's need for a biometric access management system for medical personnel on Android-based platforms, CHROMOLOGIC (CL) proposes to develop a Biometric Authentication and Identification ("BAID") system. The BAID Android app will be installed on the Army's Nett Warrior devices for medics to use as an access management tool which functions without requiring network access for use with apps including the eTCCC app. Additionally, the system enables patient identification, providing Nett Warrior device apps with a biometric ID to link eTCCC electronic cards and patient information throughout the continuum of care. BAID's

44

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

compact hardware for collecting biometrics will be stored conveniently with the Nett Warrior platform. In Phase I, CL will develop the system design, show and test a proof of concept of system hardware and software architecture for the access management and patient identification capabilities of the BAID system. The Phase II development effort will develop a ruggedized prototype and a 2nd generation software app with access management capability for use with the eTCCC app and other android applications.

m. Specific fraudulent misrepresentation(s)/misconduct: RELATOR JOHNSON learned that much of the information in the Phase I reports was falsified. Specifically, RELATOR JOHNSON learned that the Phase I option reports included falsified results and outcomes information. CHROMOLOGIC employee Ed Burns told JOHNSON that he had to make up data for the project because the persons involved in this grant kept losing sight of when progress reports were due and thus he had to make up results and outcomes when, in fact, no work had been done on the project. Burns admitted that the data in the Phase I proposal was completely false and he knew that because he had written it.

196. The Phase II contract data for BAID is as follows:

a. Contract Title: Biometric Authentication and Identification (BAID)

b. Contract Number: W81XWH-19-C-0066

c. Total Award Amount: $999,958

d. Awarding Agency: DOD/Army

e. Solicitation Number: 17.1

f. Solicitation Year: 2017

g. Award Year: 2019

h. Award Start Date: November 15, 2018

i. Award End Date: May 6, 2021

j. PI: Claude Rogers

k. Business Contact: DEFENDANT MENON

45

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

l. Abstract: In order to meet the US Army's need for a biometric identification and access management system for medical personnel and patients for Android-based platforms for operation in situations with intermittent network access, CHROMOLOGIC proposes to develop a Biometric Authentication and Identification (BAID) system. BAID consists of an Android OS application and biometric collection hardware leveraging existing biometric identification techniques to gate access to existing Army EHR databases. The BAID system will allow healthcare professionals to use a simple biometric scan to gain HIPAA-compliant access to medical records and to uniquely identify unknown patients using biometric data. In Phase I, CHROMOLOGIC developed a functional prototype of the BAID system. In Phase II, CL will refine and optimize the BAID system, including miniaturizing and ruggedizing the biometric scanning hardware, for military use.

m. Specific fraudulent misrepresentation(s)/misconduct: All the data from the EEG was falsified and this was managed by Rogers and directed by Menon.

197. Additional fraud allegations, once when Sannibale told DEFENDANT MENON that the BAID device did not work as expected, MENON became angry and threw a stack of Jenga pieces at a wall. After that, MENON ordered employee Ed Burns to "ghost write" Sannibale's solicitations because Sannibale objected to using false EEG data.

## SPECIFIC INSTANCES OF TIMESHEET FRAUD

### Johnson

198. At various times relevant to this complaint, RELATOR JOHNSON was instructed by Rogers, Axtelle, Nguyen and others at CHROMOLOGIC to falsify timesheets to indicate that he had performed work on various SBIR grant projects when he had not.

199. For example, on 3/6/2018, Susan Dixon sent JOHNSON an email advising him she was artificially allocating his time among contracts by noting, "Sorry to alarm you. I removed all Synfact & Ceretec hours from your budget because we already spent the

//

//

46

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

allotted hours. I am so busy that I didn't have time to fix it yet. I am hoping to fix it soon, definitely before Friday, when the next time card is due."

200. Likewise, JOHNSON and other employees received an email from Moreno dated 10/20/2016 telling them that they should "Use attached updated labor allocation. Please turn in our time care by tomorrow at noon and date it 10/21/2016." The "updated labor allocation" refers to the pre-populated data that employees were being directed to use. The fact that the data was "updated" indicates that the numbers were being falsified to meet CHROMOLOGIC budgetary needs and not to accurately reflect time spent on SBIR projects.

201. This included false time entries on labor cost records for the following six grant projects— Biovoto, Unitrac, Ocosmo, OFAM, Flocop and miDOS.

202. Notably, JOHNSON was neither responsible for, nor performed any work on, the Biovoto, Unitrac, Ocosmo, OFAM and Flocop projects whatsoever.

203. For example, JOHNSON received a pre-populated Labor Allocation report for the period 10'/10/16 that falsely listed 10 hours for Bio-Boto and 50 hours for FLOCOP when in fact he had spent zero hours on these projects, and, as a result JOHNSON was forced to replicate this false data on his Time Card for that period.

204. For a second example, JOHNSON similarly received and was forced to replicate false time data on a TimeSheet (No. 1098) for the period beginning 1/30/2017, which showed 10 hours for Medsem II, 10 hours for Ocosmo, 10 hours for Orient and 10 hours for Ofam II, when, in fact, JOHNSON spent zero hours on these projects.

205. CHROMOLOGIC, through Axtelle, Dixon and Pavlova submitted JOHNSON's false timesheets to the respective funding agencies.

### Yae

206. Similarly, at various times relevant to this complaint, RELATOR YAE was instructed by Axtelle, Ngyen and others at CHROMOLOGIC to falsify timesheets to indicate he had performed work on various SBIR grant projects when he had not.

//

47
**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

207. This included false time entries on labor cost records for the following four grant projects — Ofam II, Quantek, G&A, and UCLA.

208. Notably, YAE was neither responsible for, nor performed any work on, the Ofam II and UCLA projects whatsoever.

209. For example, YAE was forced to fill out a timecard based on a pre-populated timesheet for the week of 07/30/2018 stating he had spent 8 hours working on Ofam II (4 hours for 08/02 and 4 hours for 08/03), when, in fact, YAE had not worked on this project at all.

210. CHROMOLOGIC, through Axtelle, Dixon and Pavlova submitted YAE's false timesheets to the respective funding agencies.

## Other Chromologic Employees

211. CHROMOLOGIC billed the respective funding agencies for the time of current or former Biomedical Solutions Group scientists for Industrial Solutions Group projects that these employees did not support and on which they never worked, including the following people:

    a.  Wangzhong Sheng.

    b.  Katherine Fisher.

    c.  Agnes Lukaszewicz.

    d.  Edward Burns.

    e.  Lormen Lue.

    f.  Louis Chin Jones.

    g.  Ross Steinberg.

    h.  Esmaeil Heidari.

## RESEARCH FRAUD MATERIAITY

212. The Government has repeatedly notified the public that misrepresenting the research done and results achieved under SBIR contracts and awards is a form of fraud that subjects the perpetrator to administrative, civil and criminal sanctions. See, e.g., https://www.volpe.dot.gov/sites/volpe.dot.gov/files/2021-11/DOT-SBIR-Volpe-

48

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Center-Fraud-Briefing_2021.pdf (SBIR fraud includes misrepresenting work done and results achieved – plagiarized reports or falsely claiming work has been completed).; https://www.cdc.gov/os/technology/innovation/sbir/fwa.htm (SBIR fraud includes "reports falsely claiming work had been completed); https://techpartnerships.noaa.gov/wp-content/uploads/2021/07/DOC-SBIR-Mandatory-Training-Slides-and-Certification-Form.pdf (SBIR fraud includes misrepresentations concerning the use of funds expended, work performed, results achieved, or compliance with program requirements under a SBIR award).

213. The Government has successfully pursued a number of FCA cases against SBIR contractors who committed research fraud under circumstances similar to those alleged here. These include the following Department of Justice judgments and settlements.

214. *United States ex rel Longhi v. Lithium Power Techs., Inc*., 575 F.3d 458 (5th Cir. 2009). Government intervened and was awarded $5 million on summary judgment in FCA *qui tam* case where relator alleged 12 different types of technical research fraud against the United States Army, NASA, the United States Air Force, the Bureau of Missile Defense, the Office of the Secretary of Defense, and similar allegations involving the National Institute of Standards and Technologies and the Department of Energy. See also Testimony of Alfred J. Longhi, Jr. before the Committee on Commerce, Science, and Transportation, United States Senate, One Hundred Eleventh Congress, First Session, August 6, 2009.

215. **_United States v. Anghaie_**, 633 F. App'x 514 (11th Cir. 2015). Government obtains summary judgment against SBIR contractor that, among other things, plagiarized research results from doctoral student thesis.

216. **Hart Scientific Consulting International LLC** *(D. New Mex.)*. Two SBIR contractors settle allegations they violated the FCA by submitting demands for the monthly installment payments, despite knowing that the telescope they were supposed to fabricate //

49

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

for the Air Force Research Laboratory would not be delivered in accordance with the applicable contract terms.

## TIMESHEET FRAUD MATERIALITY

217. The Government has repeatedly made clear to the public that it is vital to ensure that SBIR participants have DCAA-compliant accounting systems and that they provide information on the SF 1408 that is accurate and complete and that aligns with the information provided in the SBIR proposals. See, e.g., DARPA SBIR/STTR Contracting FAQs; DCAA Pre-Award Survey of Prospective Contractor Accounting System Checklist; DCAA Real-Time Labor Evaluations PowerPoint; DCAA Manual No. 7641.90; and SBA Small Business Innovation Research (SBIR) and Small Business Technology Transfer (STTR) Program Policy Directive.

218. The Government has further warned that errors on the SF 1408 form can result in a variety of penalties, depending on the nature and severity of the error. Potential penalties can include rejection or delay in the award, ineligibility for future contracts, overpayment financial penalties, and potential legal action if the errors are deemed to be fraudulent or criminal. Id.

219. Proper labor cost accounting and employee time tracking and recording are key aspects of a DCAA-compliant accounting system.

220. The fact that DCAA conducts surprise onsite audits of such labor cost and employee time accounting systems in and of itself establishes that falsely describing and certifying these items on the SF 1408, deceiving Government representatives during onsite labor cost and employee time systems audits and falsifying hours spent on SBIR contracts, all of which occurred at CHROMOLOGIC, is material to the Government.

221. The Government has successfully pursued a number of FCA cases against SBIR contractors who committed timesheet fraud under circumstances similar to those alleged here. These include the following six Department of Justice settlements.

222. **Combustion Research and Flow Technology, Inc. (E.D. Pa.).** Company agreed to pay $192,586 for failing to accurately account for PIs' time.

50

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

223. **EMP (D. Del.)**. Company and CEO agreed to pay $2.75m where, in addition to a second theory of liability, defendants directed company employees, or caused others to direct company employees, to falsely complete timesheets for direct labor that the employees did not perform and submit false invoices and public vouchers to the funding agencies for direct labor that was not performed on these contracts and grants.

224. **Sand 9 (E.D. Va.)** Company agreed to pay $625k where the company misrepresented the integrity of its accounting and timekeeping systems to obtain the grants and failed to maintain complete timekeeping records for its employees while receiving grant funding for labor.

225. **Aquasent (D. Conn.).** Company and individual officials agreed to pay $400k where, among other things, company: made misrepresentations to NSF prior to the award of the Phase II grant, including the submission of a false FMSQ purporting to detail, among other matters, Aquasent's time and effort policies and procedures, including the maintenance of bi-weekly timesheets; made misrepresentations to NSF during the conduct of the Phase I and Phase II grants that resulted in the release of incremental funding, including false certifications as to the Phase I principal investigator's primary employment with Aquasent and the submission of Phase II project reports misrepresenting that the funds expended on time and effort were supported by timesheets or other time and effort documentation; and made misrepresentations to NSF's Office of Inspector General ("OIG") in connection with its investigation about the submission of multiple false timesheets in response to OIG's requests and subpoenas.

226. **Agave (N.D.N.Y.)**. Company paid $300k to settle allegations that former president created two false timecards for one family member, namely his daughter, which claimed that his daughter had performed work on a government contract when in fact she had not. And submitted the false timecards to the Department of Defense. Also, Agave claimed it had incurred salary expenses for other family members, when these family members had not performed work to the extent claimed by Agave. Agave submitted the false and inflated salary expenses to the Department of Defense, which relied upon them

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

in calculating the monies that would be paid to Agave, regarding approximately 44 contracts with the U.S. Army, Navy, Air Force, and Defense Threat Reduction Agency.

227. **Advanced Thermal (D. Mass.).** Company and President/COO agreed to pay $100k for falsely certifying to NSF and DOE that: (1) company maintained an adequate financial system to account for the award funds as required by regulations, (2) company would comply with the award terms and conditions, and (3) company spent the award funds and performed the research in accordance with the terms and conditions. These certifications were false because company and officer failed to prepare and maintain documentation substantiating that they used the funds for the awarded research projects, and, on occasion, that they claimed and received funds for NSF projects that were already completed. Note: while not specifically relating to timesheet fraud, the false certification that company maintained an adequate financial system generally applies equally to Chromologic's certifications that it created and maintained the required timesheet accounting system.

228. **Agiltron, Inc. (D. Mass.).** Company and CEO agreed to pay $2.25 million for engaging in a scheme in which they directed and allowed employees to charge labor hours to the awards, even when those hours did not correspond with the employees' actual time and effort. Defendants also directed and allowed employees to alter their completed timesheets, with the goal of maximizing charges to each grant or contract. Additionally, Defendants directed and allowed employees to discard or destroy documents instructing them on how many hours to charge or change on their timesheets.

## **RESEARCH FRAUD SCIENTER**

229. RELATOR JOHNSON observed DEFENDANT MENON in the "desk space" at CHROMOLOGIC's offices laughing and saying, in sum and in substance that he was favorably impressed with the quality of fake data that had been submitted to the Government and followed this up by saying, he regretted wasting so much money on lab work when it was easier and cheaper to simply make up the data.

//

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

230. Rogers openly discussed "reprocessing" data with CHROMOLOGIC scientists. Relators understood "reprocessing" data to mean fabricating data.

231. Former CHROMOLOGIC employee Louis Chin Jones, Ph.D. (Senior Scientist) raised objections to the Research Fraud scheme and was terminated by MENON.

232. The following current and former CHROMOLOGIC employees raised objections to the Research Fraud scheme and were reprimanded by MENON, but not terminated: Virginio Sannibale, Ph.D. (Senior Researcher, Industrial Solutions Group); Katherine Fisher, Ph.D. (Lead Bioinformaticist); Wangzhong ("Wang") Sheng, Ph.D. (Research Scientist); Jaw Chyng Lormen Lue, Ph.D. (Senior Research Scientist); Agnes Lukaswicz, Ph.D. (Lead Scientist); Mark Starbird (Bioengineer); Thomas Miller (Bioengineer), and RELATOR JOHNSON.

233. The following former CHROMOLOGIC employees quit their jobs in protest of the Research Fraud scheme: Katherine Fisher, Ph.D. (Lead Bioinformaticist); Jaw Chyng Lormen Lue, Ph.D. (Senior Research Scientist); Agnes Lukaswicz Ph.D. (Lead Scientist); and RELATOR JOHNSON.

234. RELATOR JOHNSON had had conversations with the following CHROMOLOGIC employees who indicated they knowingly participated in the Research Fraud scheme:

     a. Wangzhong Sheng.

     b. Katherine Fisher.

     c. Agnes Lukaszewicz.

     d. Louis Chin Jones.

     e. Thomas Miller.

     f. Mark Starbird.

**TIMESHEET FRAUD SCIENTER**

235. The following current and former CHROMOLOGIC employees raised objections to the Timesheet Fraud scheme and were reprimanded by MENON, but not terminated: Ross Steinberg, Ph.D. (Senior Associate), Evan Tsang (Head of Engineering),

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Agnes Lukaswicz Ph.D. (Lead Scientist); RELATOR JOHNSON, and RELATOR YAE.

236. RELATOR JOHNSON or RELATOR YAE had conversations with the following CHROMOLOGIC employees who indicated they knowingly participated in the Timesheet Fraud scheme:

a. Wangzhong Sheng.

b. Katherine Fisher.

c. Agnes Lukaszewicz.

d. Edward Burns.

e. Lormen Lue.

f. Louis Chin Jones.

g. Ross Steinberg.

h. Esmaeil Heidari.

## COUNT I

## RESEARCH FRAUD -FALSE CLAIMS

## (31 U.S.C. §§ 3729(a)(1)(A)

237. RELATORS reallege all the allegations in this complaint as if fully set forth herein.

238. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729(a)(1)(A).

239. In connection with the foregoing scheme to commit Research Fraud, DEFENDANTS knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

240. Such false claims were material to the United States' decision to provide SBIR grant funds to CHROMOLOGIC on behalf of MENON.

241. By virtue of these false or fraudulent claims, the United States incurred damages in an amount to be proved at trial.

//

54

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

## COUNT II

## RESEARCH FRAUD -FALSE STATEMENTS

### (31 U.S.C. §§ 3729(a)(1)(B)

242. RELATORS reallege all the allegations in this complaint as if fully set forth herein.

243. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729(a)(1)(B).

244. In connection with the foregoing scheme to commit Research Fraud, DEFENDANTS knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States.

245. By virtue of these false records and statements, the United States incurred damages in an amount to be proved at trial.

## COUNT III

## TIMESHEET FRAUD – FALSE CLAIMS

### (31 U.S.C. §§ 3729(a)(1)(A)

246. RELATORS reallege all the allegations in this complaint as if fully set forth herein.

247. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729(a)(1)(A).

248. In connection with the foregoing scheme to commit Timesheet Fraud, DEFENDANTS knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

249. Specifically, DEFENDANTS received SBIR grant funds through knowingly false statements.

250. Such false claims were material to the United States' decision to provide SBIR grant funds to CHROMOLOGIC on behalf of MENON.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

251. By virtue of these false or fraudulent claims, the United States incurred damages in an amount to be proved at trial.

## COUNT IV

## TIMESHEET FRAUD – FALSE STATEMENTS

## (31 U.S.C. §§ 3729(a)(1)(B)

252. RELATORS reallege all the allegations in this complaint as if fully set forth herein.

253. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729(a)(1)(B).

254. In connection with the foregoing scheme to commit Timesheet Fraud, DEFENDANTS knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States.

255. By virtue of these false records and statements, the United States incurred damages in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, RELATORS, each on behalf of himself, and on behalf of and in the name of the United States, demands judgment against CHROMOLOGIC and MENON as follows:

On Counts I, II, III and IV, under the False Claims Act:

1.  Ordering CHROMOLOGIC and MENON to cease and desist from violating the FCA, 31 U.S.C. §§ 3729 *et seq*.

2.  A money judgment against CHROMOLOGIC and MENON in the amount of three times the damages the United States has sustained because of DEFENDANTS' actions, plus a civil penalty for each act by CHROMOLOGIC in violation of the FCA, as provided by 31 U.S.C. § 3729(a).

3.  Awarding RELATORS the maximum relator's share available under the FCA, for bringing Count I, namely, 30 percent of the proceeds of the action by judgment

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

or settlement of the claim since the Government declined to intervene, as provided in 31 U.S.C. § 3730(d).

4. Awarding RELATORS all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d); and

5. Interest on money judgments, as provided by law; and

6. For such other relief for the United States and RELATORS as the Court deems appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, RELATORS hereby demand trial by jury.

Dated: September 18, 2024                    Respectfully submitted,


                                             KLEIMAN RAJARAM

                                             By: /s/Mark Kleiman
                                             Mark Kleiman (SBN 115919)
                                             12121 Wilshire Blvd., Ste. 810
                                             Los Angeles, CA 90025
                                             310-392-5455
                                             mark@krlaw.us


                                             McINNIS LAW

                                             By: /s/Timothy J. McInnis
                                             Timothy J. McInnis
                                             *(pro hac vice)*
                                             521 Fifth Avenue, 17th Floor New York,
                                             NY 10175
                                             Tel: (212) 292-4573
                                             Fax: (212) 292-4574
                                             Email: tmcinnis@mcinnis-law.com

                                             *Attorneys for Relators*

57
**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

# EXHIBIT "4"

ERIC P. ISRAEL (State Bar No. 132426)
*EPI@LNBYG.COM*
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Ave.
Los Angeles, CA 90034
Phone:  310-229-1234
Fax:      310-229-1244

Attorneys for Sam S. Leslie, Trustee

FILED & ENTERED

MAY 21 2025

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY toliver    DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

|  |  |
|---|---|
| In re | Case No. 2:24-bk-19380-BR |
| HAEDEUK YAE, | Chapter 7 |
| Debtor. | **ORDER GRANTING TRUSTEE'S APPLICATION TO RETAIN McINNIS LAW AS SPECIAL LITIGATION COUNSEL TO TRUSTEE [DOCKET NO. 28]** |
|  | [No Hearing Required] |

On March 11, 2025, Sam S. Leslie, the Chapter 7 trustee (the "Trustee") for Haedeuk Yae (the "debtor"), filed his Application to Employ McInnis Law as Special Litigation Counsel *(docket no. 28)* (the "application") and on May 1, 2025, the Trustee filed the Supplemental Declaration of Timothy McInnis in support of the application (*docket no. 31*).  It appears from the application that it is necessary that the Trustee employ special counsel, that said counsel represents no interest materially adverse to the debtor or the estate with respect to the matter upon which counsel is to be engaged, and that the employment of McInnis Law is in the best interest of the estate. It also appears that due and proper notice of the application under LBR 9013-1(o) was given to the debtor, the debtor's counsel, the United States Trustee, the 20 largest creditors and all parties in interest. It also appears that no objections or requests for hearing with respect to the application have been filed. Good cause appearing,

IT IS ORDERED THAT:

1

1.      The application is GRANTED in its entirety, and the Trustee is authorized to employ McInnis Law, as his special litigation counsel, pursuant to 11 U.S.C. § 327(e).

2.      The compensation to be awarded shall be fixed by the Court after notice and a hearing as may be required by 11 U.S.C. § 328 and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Central District of California, and the practice and procedure of this Court.

###

Date: May 21, 2025

Barry Russell
United States Bankruptcy Judge

2

# EXHIBIT "5"

## Kayleen Y. Chang

**From:** Tim Mcinnis <tmcinnis@McInnis-Law.com>
**Sent:** Thursday, November 13, 2025 7:32 AM
**To:** Sam S Leslie (sleslie@trusteeleslie.com); Eric P. Israel
**Subject:** court rulings and new mediation date (12/3/25)
**Attachments:** Rulings at PTC 11-10-25.pdf

Hi Sam and Eric:

On Monday, the judge ruled on 2 of 3 key issues affecting settlement, adjourned the trial without setting a new date (but later suggested it would be January or February) and ordered us back to mediation on 12/3/25. At defense counsel's request, the judge said Sam will have to participate at the mediation session. We are applying for remote participation for everyone. Please let me know if that poses a scheduling problem for Sam.

As for the rulings, the judge ruled in defendants' favor on how to fix the number of violations for penalty purposes. (He alludes to this in the attached Civil Minutes where he says he is tentatively adopting the defendants' version of the jury verdict form.) Defendants said penalties should be calculated based on the number of false "claims" (think invoices) and we said it should be the number of false records or statements (think documents supporting invoices). There would be many more of the latter and given a minimum per violation penalty of roughly $15,000 there could be a big difference in total penalties. We still believe there were many tainted invoices and are attempting to get agreement with defense counsel on the possible number.

The judge also denied our request to proceed with the so-called "fraud in the inducement" theory as an alternate way of determining liability. He alludes to this in the Civil Minutes where he says he grants defendants' Motion in Limine #2. The practical effect of this ruling is that we cannot prove that a single misrepresentation to the government at the beginning of the contracting process tainted all contracts going forward. Instead, we have to prove liability on a contract-by-contract basis. Not only does this increase our burden at trial but the judge precluded us from listing more than one or two representative employees for each category of time mischarging, so we will not be able to prove more than a handful of the roughly 90 contracts were tainted by fraud.

Finally, the judge purposefully left open the most important settlement and liability issue, namely, the proper measure of damages. We say it is the full contract amount. They say it is the over charged hours times the employees' hourly rates. They also say that since we didn't compute this amount before trial we should be precluded from putting in evidence to any damages, leaving only penalties. Unfortunately, this means we still don't know if it's a six-figure or seven-figure case. I am trying to work out some parameters on this with defense counsel before mediation. Otherwise, 12/3 could just be another waste of time (and money since I am paying myself for plaintiffs' share of the mediation services). I will let you know if the parties are able to narrow the scope of their disagreements over litigation risk and damages before mediation.

Feel free to ask any questions or make any comments. I will respond either by email or on a call.

Thank you.

Tim



Timothy J. McInnis, Esq.
McInnis Law
521 Fifth Avenue, 17th Floor
New York, NY 10175-0038

Tel: (212) 292-4573
Fax: (212) 292-4574
Cell: (917) 903-9424

Web site: (http://www.mcinnis-law.com/)

***POTENTIALLY CONFIDENTIAL AND PRIVILEGED***
*The information contained in this e-mail and in any attachments might constitute privileged and confidential information for the sole use of the sender and the intended recipient and may contain attorney client communications, attorney work product and other legally privileged and confidential information. If you are not the intended recipient, or someone responsible for delivering it to the intended recipient, please do not disseminate, distribute or copy this e-mail. If you have received this e-mail in error, please immediately notify the sender by telephone (collect) or e-mail and destroy the original e-mail and any attachments without reading, printing or saving them. Thank you.*

2

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 24-6749 PA (JPRx) | Date | November 10, 2025 |
|---|---|---|---|
| Title | Donald Johnson, et al. v. Chromologic, LLC, et al. | | |

Present: The Honorable    PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| Kamilla Sali-Suleyman | Maria Bustillos |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Timothy McInnis | Charles Sims |
| Mark Kleiman | Michael Kessler |
| Pooja Rajaram | Enaita Chopra |

**Proceedings:**          FINAL PRETRIAL CONFERENCE

Cause called; appearances made. Court and counsel confer regarding the status of the case, trial procedures, the parties' disputed verdict form and jury instructions, the two Motions in Limine filed by defendants Chromologic, LLC, and Naresh Menon (jointly "Defendants"), and settlement negotiations.

The Court tentatively adopts Defendants' version of the disputed verdict form and tentatively grants Defendants' Motion in Limine #2 (Docket No. 100). The Court defers making a final ruling on Defendants' Motion in Limine #1 (Docket No. 99). The Court confers with each side outside the presence of opposing counsel regarding settlement. That portion of the transcript is ordered sealed.

The parties represent that they will conduct a further settlement conference on December 3, 2025. The Court orders the bankruptcy trustee for Relator Haedeuk Yae, as well as a corporate representative of Defendant Chromologic, LLC with full settlement authority, to attend the settlement conference in person. The Court additionally orders Assistant United States Attorney Hunter Thomson, or other appropriate supervisor in the United States Attorney's Office for the Central District of California with management responsibilities over this action, to be available on standby during this settlement conference for purposes of confirming whether the government has any objection to any proposed settlement. Relators shall serve the United States Attorney's Office with a copy of this Order by no later than November 17, 2025.

The trial currently on calendar for November 18, 2025, is vacated and taken off calendar pending the parties' further efforts to settle this case. By 12:00 p.m. on December 5, 2025, the parties shall file a Joint Report concerning the parties' effort to negotiate a settlement and the parties' positions as to whether they are in a position to settle the case or whether the case must

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-6749 PA (JPRx) | Date | November 10, 2025 |
|---|---|---|---|
| Title | Donald Johnson, et al. v. Chromologic, LLC, et al. | | |

be tried.  If the parties conclude that the case must be tried, the Joint Report shall also include the parties' proposed new trial dates in January and February 2026.

The Court continues the final pretrial conference to December 12, 2025 at 1:30 p.m.

IT IS SO ORDERED.

|  | 1 | : | 43 |
|---|---|---|---|
| Initials of Preparer | kss | | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled **Trustee's Notice Of Motion And Motion To Approve Compromise With Chromologic, Llc And Naresh Menon And For Ancillary Relief; Memorandum Of Points And Authorities, Declarations Of Sam S. Leslie And Timothy J. McInnis And Request For Judicial Notice In Support Thereof** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 27, 2026** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

    Eric P Israel    epi@lnbyg.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com
    Roland H Kedikian    roland@kedikianlaw.com,
    g2547@notify.cincompass.com;kedikian.rolandb126341@notify.bestcase.com
    Sam S Leslie (TR)    sleslie@trusteeleslie.com,
    trustee@trusteeleslie.com;C195@ecfcbis.com
    United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

2.  **SERVED BY UNITED STATES MAIL**: On **March 27, 2026**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*Honorable Barry Russell*
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

☐ Service list attached

3.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **March 27, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*VIA EMAIL:*
Kelly Morrison - Kelly.L.Morrison@usdoj.gov; Michael Jones - Michael.Jones4@usdoj.gov;
Hunter Thomson - hunter.thomson@usdoj.gov; Daniel Kastner - daniel.w.kastner@usdoj.gov;
Charles Sims csims@ohaganmeyer.com; Enita Chopra EChopra@ohaganmeyer.com;
Timothy McInnis tmcinnis@mcinnis-law.com; Pooja Rajaram pooja@krlaw.us;
Julie Grohovsky jgrohovsky@cohenseglias.com; Nadine Sayegh nsayegh@nmslaw.net

☐ Service list attached

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 27, 2026 | Kayleen Chang | /s/ Kayleen Chang |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                  **F 9013-3.1.PROOF.SERVICE**